(68 App. Div. 60.)

## HAGAN v. SONE et al.

(Supreme Court, Appellate Division, First Department. January 17, 1902.)

1. **WILLS—PROBATE—ACTION TO SET ASIDE—PROCEDURE—BURDEN OF PROOF.**

In an action to set aside the probate of a will, under Code Civ. Proc. § 2653a, providing that the decree of the surrogate admitting the will to probate shall be prima facie evidence of its attestation, execution, and validity, where the defendants have introduced the will and the decree the burden is on the plaintiff of establishing by competent evidence that the will is not the last will and testament of the decedent.

2. **SAME—INSUFFICIENCY OF EVIDENCE—DIRECTION OF VERDICT.**

Testatrix had been divorced from her husband, to whom, after litigation, the care of their minor child was granted. Thereafter testatrix married again. From the time of her divorce until her death she never saw her daughter by her first husband, and such daughter, though married, had never made any effort, except once, to see her mother or take care of her in her old age. After the death of the second husband, testatrix became addicted to the use of liquor to excess. By her will, which was one of many, she left more to her daughter than she had ever devised her in her former wills, but the bulk of her property was left to the relatives of her second husband. There was evidence that the will was made at a time when she was perfectly rational, and in no way under the influence of liquor. The will was of the same general character as the wills which she had previously made and destroyed. A physician, in answer to a hypothetical question, testified that one with such habits as testatrix's, was never of an absolutely sound mind. *Held* insufficient to show testamentary incapacity.

3. **SAME—EXPERT EVIDENCE—QUESTION FOR JURY.**

Where, in an action to set aside the probate of a will, there is no evidence of incapacity of the testator, except the opinion of a physician who did not know deceased, expressed in answer to a hypothetical question, such answer is not sufficient to make a question for the jury.

Appeal from trial term, New York county.

Action by Katherine C. K. Hagan against Louis V. Sone and others. From a judgment in favor of defendants, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGH-LIN, O'BRIEN, and INGRAHAM, JJ.

Albert Stickney, for appellant.

Allan McCulloh, for respondents.

INGRAHAM, J. This action is brought under section 2653a of the Code of Civil Procedure, and the relief sought is to have a last will and testament made by Anna Sutherland, dated April 3, 1897, and duly admitted to probate by the surrogate of the county of New York on the 28th day of July, 1899, declared invalid. The plaintiff, who is the only child of the decedent, claims that this will so admitted to probate was void upon the ground that the

testatrix had not testamentary capacity, and that the will was, procured by undue influence. The defendants offered no evidence, and it was upon the plaintiff's testimony that the court directed a verdict for the defendants. When the case came on for trial, counsel for the defendants opened the case, introduced in evidence the will and the decree of the surrogate admitting it to probate, and rested, whereupon counsel for the plaintiff opened her case and proceeded to call her witnesses. The procedure on such a trial is regulated by section 2653a of the Code, which is the authority for the action. That section provides that:

"The issue of the pleadings in such action shall be confined to the question of whether the writing produced is or is not the last will and codicil of the testator, or either. * * * On the trial of such issue the decree of the surrogate admitting the will or codicil to probate shall be prima facie evidence of the due attestation, execution and validity of such will or codicil. * * * The party sustaining the will shall then offer his other evidence and rebutting testimony may be offered as in other cases."

It would seem quite plain from this provision that upon the introduction of the will, and the decree of the surrogate admitting it to probate, the burden was upon the plaintiff of establishing by competent evidence that the will admitted to probate was not the last will and testament of the decedent; and if, from the whole testimony, the evidence is not such as would justify an affirmative verdict, it is the duty of the court to direct the jury to find a verdict sustaining the will. Dobie v. Armstrong, 160 N. Y. 590, 55 N. E. 302. It is true that the section gives to the parties sustaining the will the right to open and close the evidence, and thus makes an exception to the general rule that the party upon whom rests the burden of proof has the right to open the testimony; but this change in the ordinary rule is by virtue of the express provisions of the statute, by which the decree of the probate is made prima facie evidence of the due attestation, execution, and delivery of the will, and imposes upon the party attacking it the burden of proving that the instrument is not the last will and testament of the decedent.

The family history of the decedent will assist us in discussing the effect of the plaintiff's evidence. The decedent was first married to William H. Kimball at 18 years of age. There was one child of that marriage, when the husband and wife separated; the custody of the child being retained by the father. Subsequently the decedent endeavored to obtain the custody of the child, and on October 7, 1871, obtained a writ of habeas corpus, requiring her husband to produce the child. The result of that proceeding was that the child was remanded to the custody of the husband, and the writ was dismissed. Subsequent to this proceeding, and on October 3, 1874, the decedent obtained a decree of divorce from her husband in the state of Connecticut, and from that time to her death she never again saw the plaintiff. There is evidence that the plaintiff, after she became of age and had been married, made one attempt to see her mother, in 1894, but her mother then refused to see her. Subsequent to this divorce the decedent married a Mr.

Robert Sutherland, with whom she lived until his death in June, 1893. After that time the decedent became addicted to the use of alcoholic stimulants, which seems to have continued down to the time of her death in September, 1897. There is no evidence that she drank to excess prior to the death of her husband, but from the evidence it would appear that she was much affected by his death, and from that time commenced her excessive indulgence, which undoubtedly was the cause of her death. On the 30th of November, 1889, the decedent made a last will and testament, giving all of her estate, real and personal, to her husband, and appointing him and one of her attorneys executors. Subsequently, and on the 22d day of March, 1893, she executed a codicil to that will, revoking the appointment of her attorney as executor, and making her husband sole executor, as well as sole legatee and devisee. After her husband's death on the 17th day of June, 1893, she made another will, whereby she gave to her daughter the sum of $5,000, and after some other legacies, amounting in the aggregate to $35,000, she gave all the rest, residue, and remainder of her estate to a sister of her husband, residing in England; and on the 3d day of August, 1893, she made a codicil to this will, which revoked the bequest and devise of the rest, residue, and remainder of her estate to her husband's sister, and gave it to her executors in trust to pay the income to her husband's sister during her natural life; and upon her death she gave one-half of the rest, residue, and remainder to two children of her husband by a former marriage, and the remaining one-half to such person as her husband's sister, who was to receive the income during her life, should by her last will and testament direct. This last will and codicil seem to have remained in force until the will now in controversy, executed April 3, 1897, was made, which gave to the plaintiff, her daughter, about one-seventh of her estate. It is thus disclosed that from the time the plaintiff was three or four years old until the time of the decedent's death there had been no relations between the mother and daughter. Upon her separation from her first husband, her child had been taken from her, and she had been unable to obtain its custody. The plaintiff had shown no disposition when she arrived at the age to have any relations with her mother, and, with the exception of one attempt in 1894, had made no effort to see her mother, and, so far as appears, had no communication with her. She was married without in any way communicating with her mother, gave no indication of a willingness to perform any of the filial duties due from a child to a parent, showed her no attention or desire to care for her in her declining years, and recognized none of the duties or obligations usually attendant upon the relation of child and parent. The mother, having failed to procure the custody of her child, seems to have entirely dropped her out of her life; and the various wills to which attention has been called, some of which were made at a period when there is not the slightest pretense that the decedent was at all incompetent to make a will, indicate a clear and deliberate intention to give to the plaintiff but a portion of her estate. The last will, now in controversy, gives to the plain-

tiff a greater share of her property than any of the other wills, executed at a time when, so far as appears, the testatrix was in perfect health, and entirely competent to judge as to the disposition which should be made of her property.

We now come to the testimony upon which the plaintiff relied to establish the invalidity of this instrument. It would be impossible to detail the voluminous testimony which was introduced upon the trial. It is quite evident that the decedent was in the habit of indulging to excess in intoxicating liquors, and at times was much under their influence; and it may also be said that, as a result, she exhibited the usual conditions that follow such excesses. When under the influence of intoxicants, she was at times quite violent and incoherent, and had delusions in relation to her deceased husband, and possibly as to others. When, however, not under such influences, she seems to have been perfectly rational, understood what she was doing, and had a clear and logical mind. During all this period down to her death she attended to her own business, received her income, and paid her bills; and, so far as I remember, no one testified that she indicated any mental confusion when not intoxicated. There is no evidence of any undue influence in relation to any of her wills, and there is nothing to justify an inference that at the time she executed this will she was intoxicated, that she did not know and clearly appreciate just what she was doing, that the testamentary disposition that she made was not the result of deliberation, or that the instrument in question did not carry into effect that disposition of the property. As before stated, she had in 1893 made a will. At the time of the execution of this will, Mr. Atwater was her attorney, and continued such until some time in 1896, when she retained Mr. Ward as her attorney. From that time down to the time of her death she seems to have corresponded regularly with Mr. Ward, who transacted business for her. These letters are evidence that during all this period the decedent clearly understood the condition of her property, and what she wished to do with it. There is no evidence of any mental confusion. In the early part of 1896 the decedent was in much need of money. It appears that at that time she was entitled to an estate in remainder in property of her father and brothers, and to relieve her present necessities an agreement was entered into with the defendant Louis V. Sone by which the decedent conveyed to Sone all of her interest in the estates of her father and brothers; Sone agreeing, in consideration thereof, to pay to the decedent the sum of $6,000 upon the execution of the agreement, and also the sum of $6,000 per year during her life, with a further payment, the amount of which was conditioned upon the time that the decedent's mother, who was entitled to the life estate, should live. This agreement was made after considerable negotiation between Mr. Sone and Mr. Ward, who then appeared as his attorney, and the decedent and her attorney, and was finally executed on the 30th of April, 1896. The correspondence in relation to this agreement is in evidence, and contains no indication of any undue influence or mental confusion. On the 13th of March, 1897, the decedent wrote to Mr. Ward a

letter, in which, after speaking of a legacy that she understood that she had received from her aunt, said:

"As I very much desire to see you 'in person' in regard to making my will, in which I desire to make you, dear Mr. Ward, who have always been the kind friend of dear old father and the boys, as well as mine, a beneficiary to the extent of $6,000, will you kindly let me know what day and at what time in the afternoon you can spare me just half an hour of your valuable time, and then I can explain all in detail to you."

Mr. Ward was called as a witness, and testified: That he called on the decedent after receipt of this letter, and told her that if she intended to give him a bequest he could not act for her in any manner in drawing the will, and that it was better that she should leave him out of the will. That the decedent said that she had made up her mind upon that point, and that was settled. The witness then said, "You will have to have somebody else," to which she replied, "I don't know of any lawyer," and he then suggested a Mr. Whitford. That after some further conversation he left her, and the decedent said she would send for Mr. Whitford. That he had no further conversation with her about the will, except that after it was executed he thanked her for remembering him. That on March 23, 1897, the decedent sent a letter to Mr. Whitford, asking him to call on her the next day. Mr. Whitford testified that he received this note from her; that he called on the following Saturday, March 27, 1897; that the decedent then asked Mr. Whitford to draw her will, and gave him instructions as to its contents; that she had a piece of paper in her hand, and read from that the names of certain legatees, and the amounts which she meant to give them, and then the names of the persons that she wished to appoint as executors; that after receiving these instructions the witness prepared the will, and took it to her on the following Saturday, April 3d; that when he got there he found Dr. Chauveau, whom she introduced as her physician; and that another witness, Mr. Ranhofer, was sent for, and the will was executed. The witness also testified that at the time of these interviews he saw no evidence of intoxication or of the influence of liquor upon the decedent; that there was no person present who took any part or made any suggestion with reference to the provisions of the will, except himself, and that the decedent had no indication of anything irrational about her; that the witness received no suggestion from Mr. Ward or anybody else, except from the decedent, as to this will; and that he never conferred with anybody else about it. Every physician who examined the decedent testified that her mental condition was apparently clear; that neither the neuritis nor the gastritis with which she was then suffering in any way affected her mind. The only remaining testimony to which we shall call attention is that of Dr. Fowler. He never saw the decedent, and was examined as an expert. He was asked a hypothetical question reciting the facts claimed to be proved by the plaintiff, and was then asked:

"Now, assuming those facts to have been proved by the evidence, or assuming those facts to be true, what, in your opinion, was the condition of that woman at the time of executing the will? Was she of sound and

disposing mind and memory on those dates? A. I should not think she was."

In answer to a further question he explains his answer. He said:

"It is possible that such a person shall often be to ordinary appearances intelligent, and be able to transact business and converse intelligently. They can write letters intelligently. They can attend to ordinary business transactions. Yet the condition of the mind and of the nerves will be decidedly diseased, as I have already stated. It is a common rule,—the common law of alcoholism. I have not very frequently in my experience seen a case where the mind was completely blotted out, except in acute alcoholism, where the intoxication is very severe at the time. But in the intervals afterwards the rule is that the anæsthetic effect remains always, and it is just like an epilepsy, where we have an explosion and a fit, and, in the interval when they are comparatively well, epileptics are very unsafe, and have a tendency to violence; and so with alcoholism. * * * During those lucid intervals the effects have ceased,—do not appear. That is down in all the books, and it is common experience. The weakness of mind and memory continue."

On cross-examination the witness testified that:

"If alcoholism has gone far enough to produce multiple neuritis, it certainly has affected the brain too. Persons so affected might be perfectly competent to transact ordinary business affairs, and might be perfectly competent to make a will. * * * A cirrhotic liver has a pretty depressing effect upon the mind, but it does not have the effect of making a person insane nor incompetent to make a will. Neither does gastritis, chonic or otherwise."

It must be perfectly evident that this opinion as to what the physician considered to be the mental condition of a person competent to make a will is not sufficient to sustain a finding that the testatrix at the time she executed this will had not testamentary capacity. To say that any one addicted to alcoholism is never of sound mind, and never recovers from the effect of the use of the intoxicant, may be true, from a medical standpoint, but it does not follow that such a condition necessarily produces a lack of testamentary capacity. In Delafield v. Parish, 25 N. Y. 29, it was said that a person, to have testamentary capacity, "must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the statute of wills, a person of sound mind and memory, and is competent to dispose of his estate by will." This definition has been repeatedly approved by the court of appeals, and has been universally adopted in this state. There is not in this case a particle of evidence to show that the testatrix had not testamentary capacity, within the meaning of this definition. During the life of her husband she intended to make him her sole beneficiary, and after his death she intended that his sister and her children should receive a considerable portion of her estate. The disposition of her property as contained in this will, which has been admitted to probate, is an expression of the deliberate intention of the testatrix made many years before; not irrational, or influenced, so far as appears, by the solicitations of any one. In the

absence of evidence of any act of the testatrix from which a jury could find that she did not have testamentary capacity, the answer of the medical witness to the hypothetical question, that the decedent was not of a sound disposing mind and memory, is not of itself sufficient to justify a jury in finding that the testatrix had not testamentary capacity. There is nothing to show what mental condition the medical expert considered as indicating that a person was not of sound, disposing mind and memory. It cannot be assumed that he had in mind the legal definition of testamentary capacity, or knew the mental condition of a person who could make a valid will. To allow such an answer to a hypothetical question to determine the validity of a will would be to vest in the medical expert the functions of the court and jury, and to allow him to decide whether or not a testatrix had testamentary capacity, and whether or not a will was valid. Upon the plaintiff rested the burden of proving the lack of testamentary capacity, and the bald statement of the medical expert that she had not a sound, disposing mind and memory, in the absence of any fact to justify such an opinion, and opposed as this opinion is to the whole testimony adduced by the plaintiff, is not sufficient to raise a question which should be submitted to a jury. As was said by Judge Gray in Dobie v. Armstrong, 160 N. Y. 584, 55 N. E. 302:

"The trial court was not required to submit the question of the testator's mental capacity to the jury merely because some evidence had been introduced by the party bearing the burden of proof. * * * The legislature never could have intended, and the statute does not compel the construction, that courts should hold that every case which is brought under section 2653a of the Code must be submitted to the arbitrament of a jury. * * * Their verdict should proceed upon such evidence as would warrant the court, in its review of the facts, in holding that it actually tended to prove such mental unsoundness in the testator, when proceeding to make a testamentary disposition of his property, as, by reason of the existence of some delusion, to render him incapable of forming a judgment as to the condition of his property, or of apprehending his true relations to the person, whom his will deprives of the share in the estate which was reasonably or naturally to have been anticipated. Such cases are fraught with the gravest consequences, and I do not believe that a solemn testamentary disposition of property should be left to the decision of a jury upon mere surmise, or upon inferences from facts which are as consistent with the one view as with the other."

Upon the whole case, therefore, we have reached the conclusion that there was no evidence which would have justified a jury in finding that this testatrix had not testamentary capacity when she executed this will, or that the will was executed as the result of undue influence.

The judgment appealed from is affirmed, with costs. All concur.