O'Brien and Hatch, JJ., concurred; Ingraham and Laughlin, JJ., dissented.

Upon plaintiff stipulating to reduce the judgment as entered to the sum of $25,710.06, judgment as so reduced affirmed, without costs; in case such stipulation be not given, judgment reversed and new trial ordered, with costs to appellant to abide event.

---

James Ralph Philips, Appellant, *v.* Martha B. Philips, Individually and as Executrix, etc., of F. Stanhope Philips, Deceased, Respondent, Impleaded with Grace MacGregor Philips.

*Action to determine the validity of the probate of a will — testimony of physicians based upon a diagnosis of incipient paresis made by one of them three years before the testator's death and contradicted by his subsequent condition — it does not require the submission of the case to the jury.*

Upon the trial of an action, brought under section 2653a of the Code of Civil Procedure to determine the validity of the probate of a will, the only evidence given by the plaintiff to support his contention that the testator was mentally incompetent at the time he executed the will was the testimony of three physicians, only one of whom had ever seen the testator. The last-mentioned physician, who had attended the testator some three years prior to the execution of the will and the death of the testator, testified that he then diagnosed the testator's illness as incipient paresis. The other two physicians testified, in answer to hypothetical questions based upon the assumption that the first physician's diagnosis was correct, that the testator was mentally incompetent at the time the will was executed.

Every physician or other person who was in a position to observe the testator during the three years prior to his death testified, on behalf of the defendants, that the development of the testator's ailment was inconsistent with the diagnosis that the testator was suffering from incipient paresis, and the physician who made such diagnosis admitted that, if the symptoms thereafter

appearing had been correctly stated by such witnesses, his conclusion that the testator was suffering from paresis was erroneous.

*Held,* that the plaintiff's evidence did not destroy the presumption of the testator's mental capacity nor the presumption which the Code of Civil Procedure provides shall follow the probate of a will.

That it was the duty of the trial court to direct a verdict dismissing the complaint.

The mere opinions of expert witnesses, based upon an erroneous hypothesis, cannot prevail as against facts opposed to such opinions testified to by a great number of competent observers.

APPEAL by the plaintiff, James Ralph Philips, from a judgment of the Supreme Court in favor of the defendant, Martha B. Philips, individually and as executrix, etc., of F. Stanhope Philips, deceased, entered in the office of the clerk of the county of New York on the 24th day of December, 1901, upon the verdict of a jury rendered by direction of the court sustaining the probate of the will of F. Stanhope Philips, deceased.

*George M. Curtis,* for the appellant.

*W. J. Curtis,* for the respondent.

O'BRIEN, J. :

The action was brought to determine the validity of the will of plaintiff's brother, F. Stanhope Philips, who died January 12, 1901. The will was dated September 24, 1900, and was admitted to probate on April 8, 1901. It gives to his wife, the defendant Martha B. Philips, all his estate, real and personal, and appoints her his sole executrix. The questions for our determination are whether or not, upon the evidence given at the trial, the plaintiff had the right to go to the jury on the subjects of testamentary capacity, undue influence and proper execution of the will.

Section 2653a of the Code of Civil Procedure provides that the issue as to the validity of a will "shall be tried by a jury * * *." And in construing this section, it was held in *Dobie* v. *Armstrong* (160 N. Y. 584) that whether evidence was sufficient to warrant the submission of any of these questions to the jury is a question of law for the court, the opinion stating that "the trial court was not required to submit the question of the testator's mental capacity to the jury, merely because some evidence had been introduced by the

party bearing the burden of proof. * * * The Legislature never could have intended, and the statute does not compel the construction, that courts should hold that every case which is brought under section 2653a of the Code must be submitted to the arbitrament of a jury. * * * Their verdict should proceed upon such evidence as would warrant the court, in its review of the facts, in holding that it actually tended to prove such mental unsoundness in the testator * * *." The opinion concludes with this language: "Such cases are fraught with the gravest consequences, and I do not believe that a solemn testamentary disposition of property should be left to the decision of a jury upon mere surmise or upon inferences from facts which are as consistent with the one view as with the other." And the conclusion reached in that case was that the evidence produced by the contestant "was not of a nature that the jury could have properly proceeded to find a verdict upon it in his behalf, and, further, that, if such a verdict had been rendered, it could not have stood the test of a motion addressed to the court to set it aside."

The force of this last statement has been destroyed by the later case of *McDonald* v. *Metropolitan Street Railway Co.* (167 N. Y. 66), wherein it was held, as correctly stated in the syllabus, that "the court cannot in any case where the right of trial by jury exists and the evidence presents an actual issue of fact, properly direct a verdict; if in such a case it is dissatisfied with the verdict because against the weight or preponderance of evidence, it may be set aside, but a new trial must be granted before another jury, and the direction of a verdict under such circumstances is reversible error."

Upon the law as now authoritatively laid down by the Court of Appeals, therefore, a verdict cannot be directed for a plaintiff or defendant, no matter how great the weight or preponderance of evidence may be in his favor, where, on the other side, evidence has been given which presents an issue of fact and upon which the jury could properly proceed to find a verdict.

With this rule in mind we have examined the voluminous record presented on this appeal bearing upon the various grounds upon which the plaintiff assails the validity of his brother's will, and for the reason that, upon the subjects of undue influence and of proper

execution of the will, no sufficient *prima facie* case was made out by the plaintiff, we may dismiss their further discussion and center our attention upon the only serious question left, namely, whether upon the subject of testamentary capacity there was at the end of all the evidence a *prima facie* case in favor of the plaintiff entitling him to go to the jury.  We start with the rule as to the order and effect of the proof necessary in cases of this kind laid down in *Dobie* v. *Armstrong* (*supra*), wherein it was said : " Ordinarily the burden of proof is upon the party propounding a will ; but section 2653a of the Code of Civil Procedure, which is the authority for the maintenance of this action, places the burden upon the defendants, who contest the validity of the will, of establishing the testamentary incapacity of the testator.  The probate of the will by the surrogate is made *prima facie* evidence of its due execution and validity."

The burden at the outset of the trial rested, therefore, upon the plaintiff of meeting the legal presumption in favor of the will arising from its probate, and to what extent he was successful we will briefly refer.

The plaintiff produced three medical experts, upon whose testimony he relies as presenting a *prima facie* case showing testamentary incapacity, one of whom alone, Dr. Dana, had ever seen the testator, and he had seen him only during the latter part of November and the first of December, 1897, some three years prior to his death and the making of his will, when, from the symptoms he then observed of the man's condition, he diagnosed his illness as the initial stage of paresis.  Upon the conclusion thus formed by him, that the testator at that time was suffering from incipient paresis, as a foundation, were built up hypothetical questions propounded to the other two experts, and upon which alone were based their opinions of his incapacity when the will was executed in September, 1900.

The plaintiff's case, therefore, rests entirely upon the opinions of the experts, and the force and weight to be given to them must necessarily depend upon the truth or falsity of the facts embodied in the hypothetical questions upon which such opinions are founded. If it was demonstrated at the close of the evidence, as on this record we think it was, that the diagnosis in 1897, that the testator was then in the initial stage of paresis, was erroneous ; and if there

was no sufficient evidence upon which the jury could find that it was true; and if in addition we find that assumptions were included in the hypothetical questions which had no basis in fact, then, clearly, as the plaintiff's case rests alone upon the answers to these hypothetical questions, there was not sufficient evidence upon the issue involved requiring its submission to the jury.

As said by Judge Finch in *Griswold* v. *N. Y. C. & H. R. R. R. Co.* (115 N. Y. 64): "Medicine is very far from being an exact science. At the best, its diagnosis is little more than a guess enlightened by experience. * * * And the wisest physician can do no more than form an opinion based upon a reasonable probability." Attaching, however, to the diagnosis here involved such weight as it is entitled to in the first instance as a diagnosis or a guess as to the testator's condition in 1897, it remains to determine whether there was any doubt at the close of the evidence as to Dr. Dana's error concerning the nature of the disease. He testified, as stated, that when the testator came to him for treatment his diagnosis was that he was in the initial state of paresis; and paresis, he says, is a condition pathologically called softening of the brain, accompanied with the symptoms of mental weakness, deterioration, physical weakness and depression, and almost universally fatal within from two to five years. He does not state, however, upon what facts he based his diagnosis, and admits that when he saw him in 1897 the testator was not irrational.

Opposed to the verity of this diagnosis, Dr. Starr testified for the defendant that the testator also came to him in December, 1897, and his diagnosis of his trouble was nervous exhaustion or neurasthenia, and that he did not observe any symptoms of paresis; that he went over his case carefully and concluded that the nervous exhaustion was temporary, and advised him to go to Europe, which he did, and when he returned he was well; that "there was an absence of any paralysis of the muscles of the eye, which is in favor of neurasthenia and against paresis; * * * an absence of any tremor of his face or of his tongue (or) knees, all of which are in favor of neurasthenia and exclusive of paresis." Dr. Monroe, who also saw the testator in the summer of 1897, testified that he was feeling feverish at the time, and had a cold and the symptons ordinarily called "grip," and that he advised him to go away, which he did; that in 1900

he was called in and found him suffering with enlargement of the kidney. Dr. Kinnicutt testified that the testator first came to him in 1898 "for some trifling indisposition," and in 1899 he diagnosed his trouble as a tumor within the chest cavity, either an aneurism or a cancer. It was further testified that these tumors or cancers increased, and their exact nature was determined upon the autopsy; and to them alone, constituting a disease apart from paresis, was ascribed by his physicians the testator's death. And the testator's physicians with other witnesses state that prior to his death, and on September 24, 1900, when the will was executed, the testator was rational, discussed various subjects intelligently, that his speech and manners were precise, and that he possessed continuity of thought and an excellent memory.

The plaintiff's expert, Dr. Ira Van Giesen, was asked the hypothetical question whether, assuming that the testator was sixty years old at his death in January, 1901, previously on friendly terms with his brother, writing him affectionate letters inclosing money and promising to provide for him in his will, which he failed to do, leaving all his property to his widow; that previous to 1897 he was a neurasthenic, and in 1897 was examined by an eminent alienist, who diagnosed his case as initial paresis of the insane; that subsequently he wrote perfectly coherent letters, and many months before his death developed painful tumors, and for many weeks prior to his death injections of morphia and codeia were administered daily for the relief of pain; "that about six weeks before his death he had delusions, imagining that a nurse who was caring for him was a ghost;" that during a conversation with his sister-in-law he showed incoherency of thought; that he was unable to sit up in bed and had to be propped up to sign his will and was much emaciated, and his signature was unlike his ordinary signature, so that those well acquainted with it could not recognize it, and the letter "e" was omitted from his middle name; that the autopsy, which did not include an examination of the brain, revealed various malignant tumors whose growth had covered many months, he was or was not on the 24th of September, 1900, of sound mind, sane or insane? He answered: "The answer is emphatic, the man could not have been of sound and disposing mind, and he must have still been insane." Thereafter he defined general paresis as "an organic affection of the

brain which is accompanied by progressive degrees of mental enfee-blement, and is characterized by certain rather distinctive and well defined symptoms which run a regular course and make a symptom complex, a disease that is of very frequent occurrence and pretty certain of recognition." And on cross-examination he testified: " Mr. Philips, three years after the diagnosis of general paresis, should have exhibited certain physical signs — certain signs of the body. He should naturally have had some interference with his speech, his articulation; it should have been upon the spanning order; he might have elided syllables or final letters of words here and there; he should have had certain irregularities of the pupils. He should have had a slight paresis of the corners of the mouth; he should have had a certain interference with his reflexes. His handwriting should, had he followed the average course of a general paretic, shown certain characteristic changes. His mental condition should have been apparent by a variety of manifestations. He should have exhibited the changeable and fitful delusions which the general paretic is filled with. He should have had the emotional conditions characteristic of that disease. He should have had the flickering and unstable attention which is indicative of that disease and, had he passed on to what is known as the second stage, when there is a still greater degradation of the mental organism, he should have been approaching or giving indications of the course of the disease towards dementia in which he was practi-cally irresponsible." The doctor further added that if paresis existed and cancer subsequently developed, it would not aid the recovery from paresis; and he admitted that paresis is one of the most dra-matic and easily recognized forms of insanity in its outspoken stages. Dr. Dana recalled, testified, referring to his diagnosis, that if there were never any symptoms after that, it would of course be affected and he should consider he had made a mistake; and that, assuming that Mr. Philips showed during the last months of his life no mental lethergy or stupor or lack of mental concentration, or interference with the train of thought, or failure of memory, and that there was continuity in his thought, that he had a good memory on various subjects, and impressed those with whom he talked as rational, that would make a difference in his opinion and he should consider him sane.

It appears, therefore, without contradiction, from the testimony of every physician or other person who was in a position to observe the testator during the three years prior to his death, that the development of the ailment from which he suffered and the causes which brought about his death were inconsistent with the diagnosis made in 1897, that he had incipient paresis, or the theory that he subsequently suffered from any such disease; and it will be further noticed that the physician who made the diagnosis, having been informed of the symptoms appearing thereafter and down to the date of the testator's death, frankly admitted that if such were the symptoms, he erred in his original conclusion that the testator was in the initial stage of paresis.

The nature of the symptoms which developed, and which in the doctor's opinion would show that he was in error, were proved by testimony which is unimpeached and uncontradicted. In this statement we have not overlooked the testimony that the testator on one occasion when he was with the plaintiff and his wife and gave them money which they accepted for a watch, went from one subject to another without completing the conversation, and they told him he was too weak to talk; but this is of such slight importance that we need not dwell upon it further, it not being contended that upon this testimony alone any conclusion as to the testator's incapacity could be founded.

With respect, therefore, to the diagnosis in 1897 we are, with the physician who made it, of the opinion, upon the evidence presented and not disputed as to the actual condition of the testator during the period from 1897 to the time of his death, that the original conclusion that he was afflicted with initial paresis was erroneous; whence it follows that all the force to be attached to the answers to the hypothetical questions asked of the medical experts is destroyed. Another fact assumed and not proved and embodied in the hypothetical questions and which it appears from the medical testimony was of great importance and strongly indicative of general paresis, was that the testator had a delusion, believing that his nurse was a ghost. Nowhere in the testimony do we find evidence that he had any such a delusion, and the only fact approaching it is that he had objected, as his attendant testified that many patients do, to his nurse wearing a white dress; and on one occasion when his nurse

bent over him and awakened him from sleep, he was for the moment frightened.

As the record stood, therefore, at the close of the entire evidence, it appeared without contradiction that the opinions of the experts upon which the plaintiff's case rested, resulted from an erroneous diagnosis and the erroneous assumption of facts, which destroyed the probative force of such opinions and left the plaintiff's case barren of any evidence sufficient to justify the submission of the issue of fact to the jury as to the testator's mental incapacity. Evidence of such a nature did not tend to destroy the presumption of the testator's mental capacity, nor the presumption which the Code of Civil Procedure provides shall follow the probate of a will. Independently of these presumptions, however, the mere opinions of expert witnesses based upon an erroneous hypothesis cannot prevail as against facts when testified to, as in this case, by a great number of competent observers. (*Buchanan* v. *Belsey*, 65 App. Div. 62; *Delafield* v. *Parish*, 25 N. Y. 29; *Hagan* v. *Sone*, 68 App. Div. 60.)

It was the duty, therefore, of the trial court to direct a verdict dismissing the complaint, and the judgment thereupon entered and now appealed from should, we think, be affirmed, with costs.

VAN BRUNT, P. J., PATTERSON, McLAUGHLIN and LAUGHLIN, JJ., concurred.

Judgment affirmed, with costs.