### PETTIT v. PETTIT et al.

(Supreme Court, Appellate Division, First Department.　March 8, 1912.)

1. WILLS (§ 427*)—PROBATE—DECREE—EFFECT.

A decree of the Surrogate's Court admitting a will to probate establishes prima facie its validity.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 916; Dec. Dig. § 427;* Judgment, Cent. Dig. §§ 1068, 1303.]

2. WILLS (§ 158*)—VALIDITY—UNDUE INFLUENCE.

A will cannot be invalidated on the ground of undue influence, unless it be clearly established that the influence exerted was such as to deprive testator of the free exercise of his intellectual powers. .

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 385, 386; Dec. Dig. § 158.*]

3. WILLS (§ 166*)—VALIDITY—UNDUE INFLUENCE.

Where the party who drew a will had been the testator's attorney, adviser, and friend for several years, the fact that he was a beneficiary under it did not show undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

4. WILLS (§ 157*)—VALIDITY—UNDUE INFLUENCE—HUSBAND AND WIFE.

It is not an exercise of undue influence for a wife to urge her husband to make suitable provision in his will for her support.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 383, 384; Dec. Dig. § 157.*]

5. WILLS (§ 329*)—ANNULMENT—SUBMISSION OF ISSUES—REVERSIBLE ERROR.

Where there was only a general verdict for the plaintiff in proceedings, under Code Civ. Proc. § 2653a, to revoke the probate of a will, it was reversible error for the court to submit to the jury, along with the proper issue, a question as to undue influence, when such question was not raised by the evidence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 774, 776–778, 786, 787; Dec. Dig. § 329.*]

6. WILLS (§ 55*)—ANNULMENT—EVIDENCE—SUFFICIENCY.

In proceedings, under Code Civ. Proc. § 2653a, to revoke the probate of a will, evidence *held* insufficient to sustain a finding that the testator did not have testamentary capacity when the will was executed.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–161; Dec. Dig. § 55.*]

7. WILLS (§ 324*)—ANNULMENT—ISSUES—EVIDENCE—EXPERT TESTIMONY.

Where the direct evidence in such proceedings showed that the testator had testamentary capacity, expert testimony, based upon a hypothetical question in opposition thereto, scarcely, if at all, raised an issue for the jury.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 225, 767–770; Dec. Dig. § 324.*]

Appeal from Trial Term, New York County.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

See, also, 134 N. Y. Supp. 137.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

Stephen O. Lockwood, for appellants.
George Gordon Battle, for respondent.

McLAUGHLIN, J.      Action under section 2653a of the Code of Civil Procedure to revoke the probate of a will upon the grounds: (1) That it was not duly executed; (2) that the testator did not have testamentary capacity; and (3) that the execution was procured by undue influence.

The testator, 76 years of age, died on the 17th of March, 1910. By his will he gave to his wife, the defendant Alice B. Pettit, stepmother of the plaintiff, an apartment house in the city of New York in which he had an equity of a little over $10,000, personal property of small value, and a cemetery plot. To the plaintiff, his only surviving child by a former marriage, he gave a cemetery plot, a gold watch and chain, and all the testator's wearing apparel. To the defendant McAllister, who had been his attorney for many years, he gave a diamond ring, studs, and cuff buttons of the value of about $650. And all the rest, residue, and remainder of his property, of the value of about $8,000, he divided equally between his wife and the plaintiff. The defendant Lockwood was made sole executor. At the trial the first ground was abandoned and the case sent to the jury upon the other two issues—undue influence and lack of testamentary capacity. It rendered a verdict in favor of the plaintiff, and the defendants appeal.

[1] After a careful consideration of the record, I am unable to find any evidence to justify a submission to the jury of the question of undue influence. Substantially all the evidence that is claimed to bear upon this issue is that the will was drawn some five months before the testator's death by the defendant McAllister, to whom were given the diamond ring, cuff buttons, and studs; that the executor was a member of a law firm with which McAllister was associated; and that the subscribing witnesses were respectively a partner and an employé of the executor. There is no evidence that any effort was made by any one to induce the testator to make the will or to make it in the way which he did. The decree of the Surrogate's Court admitting the will to probate established, prima facie, its validity, and the burden was upon the plaintiff to overcome such proof. Dobie v. Armstrong, 160 N. Y. 584, 55 N. E. 302.

"What the law terms undue influence," says the Court of Appeals in Matter of Snelling, 136 N. Y. 515, 32 N. E. 1006, "is not established by proof tending to show that the testator acted from motives of affection or gratitude, though the objects of her bounty were strangers to her blood. The influence or moral coercion, or by whatever other term designated, must be such as to overpower the will of the testator and subject it to the will and control of another, in which case it assumes the character of fraud."

[2] A will cannot be invalidated on the ground that its execution was procured by undue influence, unless it be clearly and satisfactorily established that the influence exerted, or the power used, was such as to deprive the testator of a free exercise of his intellectual powers. Heath v. Koch, 74 App. Div. 338, 77 N. Y. Supp. 513, affirmed 173 N. Y. 629, 66 N. E. 1110; Marx v. McGlynn, 88 N. Y. 357; Scott v. Barker, 129 App. Div. 241, 113 N. Y. Supp. 695.

[3] The fact that the attorney who drew the will is a beneficiary under it to a small extent does not show undue influence. Haughian v. Conlan, 86 App. Div. 290, 83 N. Y. Supp. 830; Matter of Marlor, 121 App. Div. 398, 106 N. Y. Supp. 131. This attorney had transacted the testator's legal business for several years. He, or his firm, had also acted for the testator's wife. It is quite evident he had confidence in the firm and was fond of the attorney, and it is not at all surprising that he should give him these articles. Such disposition, standing by itself, is of no significance whatever.

[4] It is true that the testator gave the greater part of his property to his widow. There is nothing to show he did so by reason of any influence exerted by her, though had she requested him to make it that way it would not have invalidated the will. A wife has a perfect right to try to induce her husband to make a suitable provision in his will for her support. The record here discloses a very good reason why the testator should have made the provision which he did for his widow. They were married in 1894, and from some time in 1895 until 1909 she kept a boarding house, and the proceeds were used towards supporting her husband and herself. There was nothing, therefore, to submit to the jury upon the subject of undue influence, and the court should have so held.

[5] In submitting this question to the jury the court erred, and this alone would necessitate a new trial, even though there were evidence to go to the jury on lack of testamentary capacity, because it is impossible to tell whether it found for the plaintiff upon one or both issues. In the absence of a special verdict, where two issues are submitted to the jury, as to one of which a verdict for plaintiff is unsupported by evidence, a judgment for plaintiff must be reversed. Rosenstock v. Metzger, 136 App. Div. 620, 121 N. Y. Supp. 52; Buchanan v. Belsey, 65 App. Div. 58, 72 N. Y. Supp. 601.

[6] Upon the question of whether the testator had testamentary capacity at the time the will was executed, it may be, under the doctrine of McDonald v. Metropolitan St. Ry. Co., 167 N. Y. 66, 60 N. E. 282, and Hagan v. Sone, 174 N. Y. 317, 66 N. E. 973, that the case had to be submitted to the jury; but its finding that he did not have testamentary capacity is, I think, clearly against the weight of evidence. It appeared that the testator, prior to 1884, was actively engaged in business in the city of New York as a builder; that in March of that year he was confined in the Bloomingdale Asylum, where he remained for four months; that he was then suffering from "manic depressive insanity," but was discharged from the asylum as improved, though subsequently the same year he spent a few months in a sanitarium; that some time before 1890 a judgment for damages was obtained against him for killing a man with a shotgun, but

it does not appear under what circumstances the killing was done, except that a witness who saw the record in that action testified "that the shotgun was accidentally discharged"; that in 1890 he exchanged some property in Saratoga, N. Y., for eight tenement houses in the city of New York, and from that time until he disposed of them, in 1901, he took exclusive charge of them, collecting the rents, paying the taxes, etc.; that the tenants of these houses were mostly colored people; that he would collect the rent by having it thrown out of the windows when he blew a whistle, and when the tenants did not throw out the rent he would fire off a pistol; that he disliked cats and devoted much of his time to driving them away from the premises; that on one occasion he fired at a cat in the yard with a pistol and came near hitting one of the tenants; that at another time he got into an altercation with one of the tenants and fired at the latter's feet; that in 1899 he went to his nephew and told him he was trying to get appointed to the position of superintendent of buildings and asked the nephew to sign his application; that he told him to write his signature as John Pettit, whereas the latter's name was John L. Pettit, and to state his address in a certain building where the nephew did not live or have an office, offering to hire a room there for him for a month so that he could give that address; that he then stated he had a letter of introduction to the mayor, which, upon inspection, turned out to have been written by himself; that during the last two years of his life he was feeble, forgetful, did not at times recognize former acquaintances, and talked disconnectedly, would hire plumbers and painters to do certain work, and upon their arrival they would find others doing what they had been hired to do; that he would then countermand his orders, saying he had forgotten hiring both; that he would make purchases in the stores and after paying therefor offer to pay over again; that after collecting the rent of his tenants he would, on some occasions, try to get them to pay the second time; that about a month before the making of the will he went to the police station and asked a police officer whom he had known for some time for a warrant in dispossess proceedings against persons who had for several years ceased to be his tenants; and that frequently he had to be assisted in dressing.

Other incidents of similar character were testified to, mostly by casual observers, and if not disproved were susceptible of explanation. Two medical experts testified assuming all of the facts stated to be true, without taking into consideration the testimony offered in explanation, that the testator, at the time the will was executed, did not have testamentary capacity.

On the other hand, it appeared that the testator, after he acquired the tenement houses referred to, and all the time he owned them, collected the rents, looked after the repairs, and took exclusive charge of them; that between 1890 and 1905 he was more or less actively engaged in business; that he sold the tenement houses; that he acquired the apartment house referred to; that he thereafter took exclusive charge of it; that up to within a very short time of his death he went about the city alone; that he was able to and did look after his own affairs; that after the execution of the will in question he went alone

to the office of the plaintiff's witness Murtha, who was an attorney and relative; that he stated he had made his will, was not satisfied with it, and wanted to make another; and that the matter was discussed between him and Murtha quite fully. This is especially significant because it shows he knew he had made a will and also what was in it.

[7] Leaving out of consideration the testimony of the medical experts based upon the hypothetical question, I am of the opinion, assuming all of plaintiff's evidence to be true, it did not justify the jury in finding that the testator did not have testamentary capacity at the time the will was executed. He had sufficient intelligence to look after his own affairs; knew who his relatives were and those who had a claim on his bounty; knew what property he had and took charge of it; knew he wanted to make disposition of it by will, and after making it discussed making another because he was not entirely satisfied with the one he had made. One who has such intelligence has testamentary capacity (Delafield v. Parish, 25 N. Y. 9; Matter of Martin, 98 N. Y. 193; Dobie v. Armstrong, supra; Ivison v. Ivison, 80 App. Div. 599, 80 N. Y. Supp. 1011), and the proof of experts, based upon a hypothetical question in opposition to proof showing such intelligence, scarcely, if at all, raises an issue for a jury.

The judgment and order appealed from, therefore, are reversed, and a new trial granted, with costs to appellant to abide event. All concur.

---

### PETTIT v. PETTIT et al.

(Supreme Court, Appellate Division, First Department. March 8, 1912.)

Appeal from Special Term, New York County.

Action by Frank X. Pettit against Alice B. Pettit and others. From a verdict for plaintiff, and an order denying a new trial, defendants appeal. Affirmed.

See, also, 134 N. Y. Supp. 133.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

Stephen O. Lockwood, for appellants.
George Gordon Battle, for respondent.

