In the Matter of the Probate of the Last Will and Testament of MATILDA E. BURNHAM, Deceased.

VICTOR H. THUN and HERMAN A. SCHUPP, Appellants; EDWARD S. SLATER and FREDERICK P. CLOSE, as Special Guardians of FREDERICK W. BURNHAM, an Incompetent, Respondents.

Second Department, June 9, 1922.

**Wills — probate — will by mother not providing for incompetent son not unnatural where provision for son made by father — lack of testamentary capacity not shown — witnesses — slight variation in testimony does not affect credibility — established facts prevail against opinion of experts that testatrix did not have testamentary capacity — trial — counsel for proponents had right to close — testimony by physician and nurse as to conversation with testatrix after execution of will admissible — no question for submission to jury.**

A will of the mother of an incompetent son which makes no provision therein for the son is not an unnatural one and contrary to the natural duty and affection of the mother, where it appears that the son, though he had not been judicially declared to be incompetent, was afflicted with epilepsy, and for many years had been confined in a State institution; that the father provided a trust fund, the income of which would amply support the son in the State institution; that the son is incurable and that the mother prior to her death visited him frequently, and otherwise showed her affection for him.

The testatrix possessed testamentary capacity at the time of the execution of the will which was offered for probate, and it was error for the surrogate to submit the question of her mental capacity to the jury or to deny probate to the will, where it appeared that the will was drawn by the attorney for the testatrix about one month before her death and was executed at her request just before an operation which she survived for a short time only; that the proponents produced eleven witnesses in support of the probate, all of whom testified that before and at the time of the execution of the will the testatrix appeared to be

rational; that the witnesses for the proponents included the two subscribing witnesses to the will, one of whom was the nurse in attendance upon the testatrix, the physician of the testatrix, a banker with whom she did business, and several friends of the testatrix and her family who had known her for a long time; and that the only evidence offered by the contestants to sustain the charge of mental incapacity, predicated on the fact that the testatrix was in a dying condition and weakened by disease at the time the will was executed, was the testimony of two doctors who had never seen the testatrix, each of whom based his opinion solely upon a hypothetical question which they both assisted in preparing.

The credibility of the testimony of the two subscribing witnesses was not affected by the fact that there were slight differences in their testimony, and that there were variations also between the testimony which they gave on the preliminary examination before the surrogate, and on the trial, for their stories are substantially the same, and the slight difference in detail therein is evidence that they were endeavoring to tell the truth.

The opinion of the medical witnesses that the testatrix was not competent, and did not possess testamentary capacity, cannot prevail against the established facts in the case which show that she knew at the time of the execution of the will that she was signing her name to her last will and testament; that she sent for witnesses to her will and for her lawyer who had drawn the will a month before, and that she knew and realized at the time of the execution of the will that she was seriously ill and that death was then imminent.

The court should not have denied the counsel for the proponents the right to make the closing address to the jury.

It was error for the court to refuse to permit the doctor and the nurse who were in attendance on the testatrix, immediately before and after the operation from the effects of which she died, to testify concerning conversations carried on by the testatrix with the witnesses a few hours after the execution of the will.

The verdict of the jury that the testatrix lacked testamentary capacity is against the evidence and the weight of the evidence, and should be set aside, and the will admitted to probate.

APPEAL by the proponents, Victor H. Thun and another, from a decree of the Surrogate's Court of the county of Westchester, entered in the office of said Surrogate's Court on the 27th day of June, 1921, denying probate to the alleged will of Matilda E. Burnham, deceased, and also from an order entered in said office on the same day denying proponents' motion for a new trial made upon the minutes.

*Martin Conboy* [*Joseph F. Collins, Edwin N. Moore* and *Herman A. Schupp* with him on the brief], for the appellants.

*Frederick P. Close* [*Edward S. Slater* with him on the brief], for the respondents.

MANNING, J.:

The will was rejected on the ground that the decedent lacked testamentary capacity, and the action of the surrogate in refusing probate followed a finding to this effect by a jury.

The record shows that originally there were cross-appeals by

the proponents and the contestants, but the special guardians, who were the contestants before the surrogate, declare now that they will not urge their appeal; and so, the only appeal before us for consideration is that of the proponents, who appeal from so much of the surrogate's decree as denies probate; and also from an order denying a motion made upon the minutes to set aside the finding of the jury and for a new trial.

The petition for probate was filed on November 15, 1920, by the executors named in the will. Thereupon a citation was issued returnable November 30, 1920, and directed to Frederick W. Burnham, the only child of the decedent, who is an alleged incompetent, and service of the citation was directed to be made upon a special guardian who was appointed by the surrogate for that purpose. The special guardian so appointed made two separate reports, the first one, dated November 30, 1920, stated that there was no valid objection to the probate of the paper offered, but on December 1, 1920, he filed a supplemental report in which he stated that he desired to withdraw his report and consent, in view of the fact that a more careful examination of the will offered for probate disclosed that no provision had been made therein for the alleged incompetent, and that consequently he, the special guardian, thought it was incumbent upon him to make a thorough examination into all the facts and circumstances surrounding the execution of the propounded paper; and that the testimony of the subscribing witnesses should be taken, transcribed and made part of the proceeding, and he requested that the surrogate so order and designate a day on which such proof should be taken. Thereupon the surrogate appointed an additional special guardian for the alleged incompetent; and subsequently, and on December 10, 1920, the subscribing witnesses were examined before the surrogate. This examination was conducted by Mr. Herman A. Schupp, the attorney who drew the will and also an executor named therein, and by one of the special guardians and also by the surrogate.

On December 23, 1920, the special guardians on behalf of the alleged incompetent filed formal objections to the probate of the paper. In consequence of the filing of these objections, an order was made by the surrogate, framing issues, and directing that the trial thereof be had before the surrogate and a jury. These issues, and the manner in which they were determined, is shown by the record as follows:

" I. Did Matilda E. Burnham, the testator, subscribe the paper offered for probate at the end thereof in the presence of the attesting witnesses or acknowledge to each of them that such subscription appearing on said paper had been made by her? "

At the end of the trial the surrogate withdrew this issue from the consideration of the jury and directed a verdict thereon in favor of the proponents.

" II. At the time of making such subscription or acknowledgment did the said Matilda E. Burnham declare to the attesting witnesses that the paper offered for probate was her Last Will and Testament? "

This was withdrawn from the consideration of the jury and a verdict thereon in favor of the proponents was directed by the surrogate.

" III. Were there at least two attesting witnesses, each of whom signed his or her name at the end of said paper at the request of said Matilda E. Burnham? "

This issue was also withdrawn from the consideration of the jury, and a verdict thereon in favor of the proponents was directed by the surrogate.

" IV. At the time of the execution of the paper offered for probate was the said Matilda E. Burnham of sound and disposing mind and memory? "

This issue was submitted to the jury and the verdict thereon was in favor of the contestants.

" V. At the time of the execution of said paper was the said Matilda E. Burnham free from restraint? "

This issue was submitted to the jury and the verdict thereon was in favor of the proponents.

" VI. Was the execution of the said paper by the said Matilda E. Burnham caused or procured by fraud, deceit, or undue influence of the proponents, or any other person or persons? "

This issue was submitted to the jury and the verdict thereon was in favor of proponents.

It thus appears that out of the six questions submitted to the jury, five were decided in the proponents' favor, and that one question only, that of the testamentary capacity of the decedent, was decided in favor of the contestants; and so we have before us on this appeal the sole question, and that is, was the decedent possessed of testamentary capacity at the time she executed the will offered for probate?

After the trial, and before the entry of a general verdict on the jury's findings, various motions were made by both parties to set aside certain of the jury's findings. The court reserved decision on these motions, and subsequently, on June 14, 1921, denied them. A decision was entered upon the opinion of the court, and in which opinion (115 Misc. Rep. 588) the learned surrogate upheld the jury's verdict that Mrs. Burnham did not have testamentary capacity. In so doing I am of the opinion the learned

surrogate erred, the case as I view it being entirely barren of any evidence to justify such a conclusion.

The testatrix, Matilda E. Burnham, at the time of her death, November 6, 1920, was about seventy-two years of age. She was the widow of one Capt. William D. Burnham, who died in March, 1919. The family home was at Port Chester, N. Y., and so far as financial circumstances are concerned it is evident that they were well-to-do people. The husband left an estate of something like $430,000, and Mrs. Burnham's property amounted to about $142,000. They had only one child, a son, who survived both of them, and he at the time of his mother's death was about forty-three years old. Though never judicially so declared, this son was incompetent, being a sufferer from epilepsy. He had been afflicted with this malady since he was eleven years old, and during childhood and in fact early manhood until about the age of thirty he was nursed, attended to and cared for to the fullest extent by his mother, in the family home. She preferred to do this rather than to hire a nurse to look out for him. When the young man grew up, and his mother, as she expressed it, " could no longer handle him," the husband insisted upon the son being sent to an institution where he could be properly cared for. This was about ten years prior to Mrs. Burnham's death. The young man was first sent to the Craig Colony for Epileptics, and after a short time there he was transferred to the Hudson River State Hospital, where he still remains. He is suffering from a " progressing deterioration of his mental faculties " and is also subject to frequent convulsions and epileptic attacks; sometimes having as many as fifteen or twenty seizures a month. He is in a State institution, has a room to himself and apparently receives careful and constant treatment for which the State makes a charge of six dollars per week, such amount being the maximum charge permitted.

Reference is made to these facts concerning the son, for the reason that it is charged by the contestants and also stated by the learned surrogate in his opinion that the will of Mrs. Burnham is an unnatural one and contrary to natural duty and affection, for the reason, I presume, that no pecuniary provision is made in the will for the support of the son. I confess, as I read the testimony in this case, that the accusation and criticism seem entirely unwarranted. It is true that under the provisions of his mother's will, the one offered for probate and rejected, the unfortunate young man receives no part of her estate. He is not, however, left unprovided for nor is there any danger of his becoming an object of charity, for the reason that under his father's will there

40

is a trust fund of $15,000 created for his benefit, the interest of which is directed to be applied to his care and support; and such interest and income seems ample where the maximum charge is limited to $6 per week. Of course we must assume that money to him means nothing, nor the extent of his estate, whether it be much or little. He is apparently well cared for now, and the placing of more money to his credit would simply result in affording an opportunity for others to profit by the situation without corresponding benefit to the young man himself, whose physical and mental condition is indeed a pitiable one. His health is such as to afford no reasonable belief that it will ever be better. That his mother never lost her natural love and affection for him is amply proven by the record in this case. She visited him at frequent intervals; she took him out driving, spoke of him frequently to her friends, and even proposed having him come home if his condition warranted. That the subject of the young man's condition and the question of an allowance for his support was considered thoughtfully by both parents is evident from a reading of their wills, *i. e.*, the will of Captain Burnham, Mrs. Burnham's first will dated July 14, 1919, and the propounded will here under consideration. Upon examination of these documents it will be observed that the mother expressly mentions the provision for her son made in the will of her husband. The first will of Mrs. Burnham was executed July 14, 1919, a few months after her husband's death, and the contestants urge that there is a vital change in the two testamentary papers executed by the mother; and that the result of the admission to probate of her first will would be that the incompetent's estate would be increased by a sum of about $30,000, by reason of the fact that certain charitable bequests to that amount attempted to be made by Mrs. Burnham are necessarily void under section 17 of the Decedent Estate Law. The legal situation claimed is conceded by the proponents, but nevertheless they assert that such a contingency, even though it does exist, affords no *legal* ground for refusing probate to the last will and testament of the testatrix, and that the verdict of the jury and the action of the surrogate in rejecting Mrs. Burnham's last will, on the ground of lack of testamentary capacity, is erroneous, as being clearly against the evidence and the weight of the evidence; and that the decedent has been declared by a jury not to be of sound and disposing mind and memory at the time of the execution of her will, solely upon the testimony of two medical experts who never saw her and whose testimony is composed of answers to hypothetical questions. They further assert that no witness was called or produced by the contestants who

had actually observed Mrs. Burnham or participated in any conversations with her, and they further point out the fact that there was no testimony by any witness that her actions or conversations impressed the observer as being of an irrational character. And their contention is that the surrogate was not justified in submitting the question of her mental capacity to the jury at all.

This brings us, therefore, to an examination of the essential facts bearing upon the question to be determined, namely, at the time of the execution of the will of November 5, 1920, was Mrs. Burnham of sound and disposing mind and memory? To show that she was, the proponents direct our attention to the evidence submitted upon the trial as disclosed by the record in this case.

The proponents produced eleven witnesses in support of the probate, and from the testimony given by them we have the following facts regarding the execution of the paper and Mrs. Burnham's condition and actions at the time: The will offered for probate was executed by Mrs. Burnham on the evening of November 5, 1920, between seven-thirty and eight-thirty o'clock, at her home in Port Chester, N. Y. She was grievously ill at the time, and shortly after the document was signed she was removed with her consent to the United Hospital at Port Chester, where she was operated upon. She survived the operation a short time only. She recovered consciousness, however, and recognized persons in the room after the operation, but her death ensued at about five o'clock on the morning of November sixth; and the record shows, and there is no dispute about the fact, that she had been a sufferer from serious bladder trouble for about fifteen years. She also suffered from a fistula, and in the latter part of October preceding her death, Bright's disease developed. According to the testimony of her family physician, her death resulted from a growth involving the descending colon or part of the large intestine, which gradually produced a stoppage of the bowel tract which became complete on the morning of November 4, 1920. Nearly all of the testimony concerning the details of her illness has to do with a period of time between June 2, 1920, and the day of her death. From June 2, 1920, it appears that she was attended by a trained nurse, a Miss Bender, who took care of her until about the first week in August, when Mrs. Burnham was well enough to go to her country home in Sharon, Conn. There she remained until September, a period of five or six weeks, when she returned to the Port Chester home, and Miss Bender resumed her nursing and continued to care for Mrs. Burnham until her death.

The nurse, Miss Bender, is one of the subscribing witnesses to the will, and her version of what transpired at the execution of

the will is as follows: " Q. Were you in attendance upon her on the evening of November fifth, 1920? A. Yes. Q. Will you state what transpired on that occasion with reference to the execution of her will? A. It was around seven-thirty in the evening when her niece and the captain's cousin and I were sitting in her bedroom, when her niece Matilda Thomas and the captain's cousin Mrs. Anderson were in her bedroom. Everything was quiet, when all of a sudden she called my name, ' Miss Bender, send for Mr. Schupp.' She then began vomiting and I asked Miss Thomas to do so, which she did. At that moment the door bell rang. I was alone in the room. She said, ' I have papers I must sign.' Mr. Schupp was sent for and he came. She * * * wanted to sign the, will. She spoke to Mr. Schupp. When the telephone rang I went to the telephone and left Mr. Schupp and she [Mrs. Burnham] alone in the room. Q. Mr. Schupp was her attorney? A. Mr. Schupp was her attorney * * * Mr. Schupp was in the room with Mrs. Burnham. After I answered the phone I was coming back when Mr. Schupp asked me to step out a few minutes. I did and I was called in and Mrs. Burnham wanted another witness to her will. She thereafter asked for Miss Sullivan, her next door neighbor, who Miss Thomas, her niece, called on the telephone. Miss Sullivan came over and she and I witnessed the will,"— in her presence and in the presence of each other. " Q. Did Mrs. Burnham ask you to sign that * * * ? A. Miss Sullivan was called over and she and I was in the room. Mrs. Burnham signed her will, then Miss Sullivan signed it in both the presence of Mrs. Burnham and myself and I signed in the presence of Miss Sullivan and Mrs. Burnham. After it had been signed Mr. Schupp stood at the foot of the bed and he said, ' Mrs. Burnham, this is your last will and testament.' She said, ' yes.' [He] Says ' you are not entirely pleased with your testament and when you get well you will make another one,' and she said ' yes.' That was all in connection with the will."

This witness further testified that Mrs. Burnham's actions at the time impressed the witness as being rational.

The other subscribing witness, Mary E. Sullivan, also testified regarding the execution of the will. She said she was the next door neighbor of Mrs. Burnham; that she had seen Mrs. Burnham at infrequent intervals during a period of twenty years, when she, the witness, was in the habit of visiting her sister who lived next door to Mrs. Burnham. She said that for the last three or four years she herself had been living continuously in this house and saw a great deal of Mrs. Burnham. She testified concerning the execution of the will, saying: " A. I was sitting in my room upstairs

with my nieces when the telephone rang, and one of the girls went and they said, ' It is you, Aunt Mary,' so I went to the 'phone and Miss Thomas said come over right away or something to that effect. I don't know just exactly the words, but they said, she says, ' Auntie wants you,' so with that I had only a step or so. I went over. Q. Who was Auntie? A. Mrs. Burnham. Q. What did you do? You went across? A. I went right across. It is only a step and I waited until * * * first stayed down, I think, in the parlor. I don't know exactly. I did not take note of it because I did not know at the time it was of any importance. * * * Q. After you got in the bedroom tell us what transpired in there. A. I went there and shook hands with Mrs. Burnham. I don't remember just exactly what was going on. They were standing around there and I was holding her hand talking awhile to her and the nurse was there and Mr. Schupp was there and so then they had the papers there to sign and she asked Miss Bender to get her her glasses, and she was looking for them, she [Mrs. Burnham] said ' they are on the dresser.' * * * So she brought her glasses and I stood there while she signed her Will and then I signed it, went right to the foot of the bed and I signed it and Miss Bender signed it, and then Mr. Schupp said to her, ' Mrs. Burnham, is this your last will and testament,' and she said yes, and he asked — I cannot get exactly which she had, this or that. I may make a mistake but I know, I remember distinctly he asked me if I saw Mrs. Burnham sign it, and if I saw Miss Bender sign it, and I said yes, and he asked the same of Mrs. Burnham and also of Miss Bender. Q. Did Mrs. Burnham sign it in your presence? A. Yes. Q. And in Miss Bender's presence? A. Yes. Q. Did Miss Bender sign it in your presence? A. Yes. Q. Did you sign in her presence? A. Yes. Q. Did you sign in Mrs. Burnham's presence? A. Yes. Q. I show you this and ask you if this is the instrument to which you referred as having been signed by Mrs. Burnham? A. Yes." The witness then identified the signatures to the document in question. " Q. Did the actions of Mrs. Burnham at the time impress you as being rational or irrational? A. Rational."

The witness testified further on cross-examination, as follows: " Q. Maybe I did not hear you, but did you tell the jury anything about Mr. Schupp saying, now Mrs. Burnham, this will is not quite satisfactory to you. You did not tell us about that? A. No. Q. Suppose you tell us about that. A. He stood at the foot of the bed and said something like this, now, this will is not just exactly what you would like, but when you get better you will make a new one, something to that effect. That is as near as I

can tell it. Q. What did she say, yes? A. She said yes, just like that. Q. He asked her, he said is this your last will and testament? A. Yes. Q. She just replied yes? A. Yes. Q. He said this will is not quite satisfactory to you, or not what you want, or words to that effect, and then asked, you can make another one when you get better and she said yes. Is that right? A. Yes, something to that effect."

In the brief of the contestants an effort is made to criticize the testimony of these two subscribing witnesses, and it is pointed out that the evidence given by them on the probate of the will differs from the evidence given upon the preliminary examination of these very same witnesses held before the surrogate at the request of the special guardian which has been heretofore referred to.

A careful examination of the testimony, however, convinces me that there is no reason for this criticism because the stories told by both witnesses are substantially the same. There may be slight apparent variances pointed out, but nothing to justify any reflection upon the truthfulness of the story as given by both witnesses. I think the so-called slight difference in the testimony is to be taken as an evidence that the witnesses are telling the truth. As was said in *Matter of Seagrist* (1 App. Div. 615, 617): " Upon the hearing before the surrogate there was practically no dispute as to what occurred at the time the will was made, nor is there the slightest reason to doubt that the story of what took place at the execution of the will by the proponent's witnesses is substantially correct. It is quite true that they do not agree in all the details of the transaction, but it is a familiar experience that where several witnesses are called upon to testify to the same transaction, there is apt to be some discrepancy as to the minor details of it. Indeed, if witnesses should agree as to every detail of a transaction which occupied a considerable space of time, and should undertake to tell all that occurred in precisely the same order, each giving the same incidents as the others in precisely the same words, that fact would be of itself a suspicious circumstance. (*Matter of Lyddy*, 5 N. Y. Supp. 636.)"

According to the testimony of Miss Bender, the nurse, Schupp, who was Mrs. Burnham's lawyer, and the draftsman of the will, came to Mrs. Burnham's house during the evening of November fifth but did not see her. Miss Bender says that she told Mr. Schupp that Dr. White did not want her to have visitors that day. About the last day of October or first of November Miss Bender says she told Mr. Schupp that Dr. White said he did not think Mrs. Burnham was going to get well. Late in the evening of November fifth Mrs. Burnham said to Miss Bender, " I guess

my day has come;" and on the examination of this witness before the surrogate on December 10, 1920, Miss Bender gave the details of this conversation as follows: "It was around half-past six and she turned to me and asked me what her trouble was and I merely said to her, I said, ' Mrs. Burnham, Dr. White has spoken to you and told of your condition, and we will not bring it up now. We will just let it pass off,' and she turned to look at me and she said, ' Miss Bender, I have been made reconciled to what my condition is.' She said everybody has their time and I believe my time has come, and there was silence for at least a half hour when everything was absolutely quiet and out of a clear sky she said, ' I must have Mr. Schupp, get Mr. Schupp. I have some papers to sign and I must sign them now.' * * * " Mrs. Burnham then became ill; and Miss Bender asked Miss Thomas to send for Mr. Schupp, and this Miss Thomas did, saying over the telephone, " Mr. Schupp, Auntie is asking for you. Will you come around as soon as you can? " Miss Bender further testified that when Mr. Schupp came into the room he shook hands with Mrs. Burnham and asked her how she was, and she said, " I am feeling pretty sick " or some remark of that sort.

The will was then executed as hereinbefore detailed by the witnesses, and Mrs. Burnham in executing it wrote her name around the red seal which had been attached, apparently to avoid writing upon the seal itself.

The nurse's testimony is to the effect that during the entire time that she was acting as a nurse for the testatrix she had conversations with her every day continuing almost until the moment of her death, and the witness said that Mrs. Burnham's actions at the time of the execution of the will impressed her as being rational.

It is admitted that the will offered for probate was prepared by the lawyer, Mr. Schupp, on or about the first of October preceding the death of Mrs. Burnham, and was not prepared by him at her bedside when he called at the time of its execution. Mr. Schupp had been her lawyer for a long time and had also acted for her husband in a professional capacity. He did not sign the will as a subscribing witness, and although he offered to testify or make a statement on the trial, the surrogate held, and properly so, that he was disqualified under the law and could not testify as a witness. (See Code Civ. Proc. §§ 835, 836; now Civ. Prac. Act, §§ 353, 354.)

In the picture presented by the testimony of the subscribing witnesses to the paper offered for probate, I see nothing whatever to indicate a lack of testamentary capacity on the part of the decedent. It is true, in fact it is not disputed, that at the time

of the execution of the paper in question, Mrs. Burnham was in a very serious condition and was practically at the point of death, and that she did die the following morning; but aside from the extreme physical weakness which would be expected in such a situation, there is nothing to show that there was any impairment of her mental faculties. In fact the reasonable inference from all the circumstances is directly to the contrary, and hence it would appear that she realized her own serious condition on the evening of November fifth; and the evidence discloses that she had mentality sufficient to send for her lawyer who had under her instructions prepared the will more than a month before, a will that she had intended to execute at his office but had neglected to do so; that she selected the subscribing witnesses, and that she herself attended in every detail to the execution of the document offered for probate.

In addition to the testimony of the subscribing witnesses, the proponents called Dr. John F. White, who had been the family physician of the Burnhams for about seventeen years. This physician is the same one who was in attendance upon Mrs. Burnham when she died and had been attending her for some time prior to her death, during which time he had many conversations with her. On November 5, 1920, the day the will was executed, the doctor called on his patient twice, the first time between six and seven, and later between half-past eight and half-past nine, in the evening. On each of these occasions he talked with Mrs. Burnham relative to her condition and the advisability of an operation; on the earlier visit he had asked her about her general condition. He testified that her actions were rational.

Victor H. Thun, another witness called by the proponent, was well known to the Burnham family. This witness is an executor of the will of Captain Burnham and had been associated with him in the steamship business. The witness had seen Mrs. Burnham, the deceased, at her home on an average of once a week since the death of her husband, except the times when she would be absent from Port Chester during the summer. On these visits he discussed various subjects with Mrs. Burnham relative to her own financial affairs, the business of her husband's company, and questions affecting her son, her employees or servants, and her friends. This witness said that he discussed the preparation of the will in question at various times between March, 1919, the time of her husband's death, and October, 1920, when the will was drafted. He talked with her concerning the amount of money she loaned to her chauffeur to enable him to buy a house; and he had advised her to make the loan of the money to her chauffeur by way of a mortgage so as to insure the continuance of the

chauffeur's services.   He also testified that he discussed with Mrs.
Burnham the drawing of her original will in July, 1919, when
she selected Mr. Schupp to draw the will.   Schupp was one of
the executors with the witness Thun of her husband's will, and
she had known Schupp's wife since the latter was a child, and was
particularly fond of her.   He also talked with her concerning her
son and his unfortunate condition.   This witness further testified ·
that after her husband's death, he, the witness, discussed with
her the purchase of securities and notes, with her accumulated
funds; that she would place the securities in a safety vault, and
that she attended to the collection of the interest and cut off the
coupons, and that she kept a note book with the due dates therein,
and checked them off.   He further told of a conversation that he
had with Mrs. Burnham wherein she spoke about some criticism
of her husband because he had not. left more to Port Chester
institutions; that this had hurt her, and she told the witness she
might do something herself.   These conversations, with others,
continued down to November 2, 1920, three days before the will
in question was executed, and he testified that all of her conver-
sations and actions impressed him as being rational.   He further
testified that she told him in October, 1920, at the time he had
spoken to her about the mortgage on the chauffeur's house, that
she was ready to see the lawyer, Mr. Schupp, and that he notified
Schupp that Mrs. Burnham was ready for the preparation of her
second will.   He further testified that she afterwards told him
that the will had been prepared, and that she would step down
to the lawyer's office the first time that she went down town, and
sign it.   The testimony of this witness as to the date and preparation
of the will is fully corroborated by the typewritten date which
the will bears, and from which it appears that it was originally
drawn to be executed in the month of October.   So that it is shown
that the will was actually prepared and was ready for execution
a month before it was executed.   This witness was subjected to a
long and gruelling cross-examination by the contestants' counsel,
which was mainly directed to ascertain whether or not the witness
had been strictly accurate in his statement that he had taken
dinner at Mrs. Burnham's home every Monday night from the
date of her husband's death.

Mrs. Lila Allen, another witness called by the proponents, had
known the Burnhams and been close friends of theirs for over
twenty years.   This witness had frequent conversations with Mrs.
Burnham on personal affairs and also in reference to the condition
of Mrs. Burnham's son.   This witness also testified that Mrs. Burn-
ham's conversations and conduct impressed her as being rational.

Testimony of a similar character was given by Henry O. Hubbell, a carpenter who had done work on different occasions for Mrs. Burnham, the last time in the month of August, 1920; he also testified that the conversations and transactions had with her impressed him as being entirely rational.

John W. Ingman, an officer of the First National Bank of Port Chester, had known the Burnhams for over twenty years, during which time he had seen Mrs. Burnham frequently. He said that Mrs. Burnham was in the habit of going to the bank nearly every week to make deposits and draw checks; and after her husband's death she looked after the investments and took a deposit box of her own. This witness saw Mrs. Burnham frequently and had many conversations with her, the last one during one of her regular visits in the summer of 1920. He testified that her conduct and conversations were entirely rational.

Edward T. Buttree, Mrs. Burnham's grocer, had known her for about ten years. She traded with him, and he generally waited on her. She was last there in July, 1920; he talked with her on various matters. Her conversations and acts impressed him as being rational.

This practically made up the proponents' case with the exception of John W. Diehl, cashier of the Port Chester Bank, who was one of the subscribing witnesses to the first will of Mrs. Burnham which was made in July, 1919; but he was not permitted to state the circumstances under which that will was executed.

Dr. Clarence H. Bonnell, a practicing physician at Port Chester, who had been in attendance on Captain Burnham and Mrs. Burnham during the absence of their physician Dr. White, was not permitted to state that the conversations had with her and her conduct as observed by him impressed him as being rational; and Julien Nelson, who had been a lifelong friend of Mrs. Burnham and her husband, had talked with her and had seen her about a month before her death. He could not recall her exact conversation at that time, but had observed her conduct on all occasions when he was there. This witness was not permitted to state whether after observing her conduct and conversations he was impressed at the time that they were rational or irrational.

As against this array of testimony in support of the paper propounded as Mrs. Burnham's will, the only evidence tendered by the contestants to sustain the charge of mental incapacity and the inability of Mrs. Burnham to make a valid will owing to the fact that she was in a dying condition and weakened by disease, is to be found in the testimony of two doctors, each of whom based his opinion solely upon a hypothetical question which assumes a

statement of facts purporting to contain a complete history of the decedent's ailments and her condition at the time her will was executed. One of these doctors swears that he never had seen Mrs. Burnham, and of course never had the opportunity of observing her personally. He had been retained about two weeks prior to the trial as an expert. He admitted that he assisted in the preparation of the hypothetical question to which he gave the answer, and while this witness swore that Mrs. Burnham was irrational at the time the paper was executed, basing his opinion upon the fact that she was in a dying condition and suffering from a severe and painful disease, yet he reluctantly admitted upon cross-examination that she knew she was sick and that she had an appreciation of the fact that her illness was of a serious character; and that she also realized that her death was imminent; and that her answer to a question of the nurse would indicate that she understood what the nurse told her. The testimony of this witness is very unsatisfactory. It is a mass of conjecture, speculation and contradiction; for he had already sworn that as a result of her condition she was unable to comprehend her condition and the general situation in which she was placed. As proof of the fact that this same witness based his so-called expert opinion, not upon the conduct and conversation of the decedent, but upon what he, the witness, conceived to be the consequences of the disease from which she was suffering, the following statement by him in answer to a question of the proponents' counsel is somewhat illuminating: " In the condition of mind such as I have described an individual is apt to be, I think this deceased was in a condition in which she would be very readily led to by questions or suggestions, and to answer to a considerable extent in the way the question was put." This answer, of course, would indicate that the decedent had mental capacity, but was subject to undue influence, something which is entirely out of this case; for the finding of the jury is to the effect that the woman was not subject to undue influence at all. The same witness when shown the signature of the testatrix, concededly written by her when she was, as he says, in a dying condition, said that although she did sign it, and knew that she was signing her name, yet she did not have complete comprehension.

An examination of the signature of the testatrix, alone, is sufficient to contradict the expert so far as this phase of the case is concerned. The established facts also contradict him. If she knew she was signing her name, if she knew and realized that she had sent for witnesses to her will, if she knew that she had sent for the lawyer who had drawn the will in question, which

will had been drawn more than a month before the day that she
executed it; if she knew and realized that she was seriously ill,
and if she knew that her death was then imminent, she certainly
must have had sufficient mental capacity to apprehend the situation
in which she was placed at the time, and this being so, the rule
applies as laid down in *Buchanan* v. *Belsey* (65 App. Div. 58, 62):
" Where the opinion of a medical witness is contradicted by the
facts, the facts must prevail."

The other medical expert agreed with his colleague. This
gentleman was also an entire stranger to Mrs. Burnham, and had
never seen or talked to her. He frankly admitted that he too
assisted in the preparation of the hypothetical question. He also
admitted that he was specially retained in an effort to break the
decedent's will, and he expressed the hope that he would be paid
for his services.

The testimony of these two medical men together with the
nurse's charts showing the progress of Mrs. Burnham's illness, is,
as I have said, all the proof submitted on the part of the contestants,
in an effort to destroy the will; and a careful examination of the
record shows that it is barren of any other evidence which justified
the surrogate in submitting the question of her mental capacity
to the jury.

In my opinion the case should not have been submitted to the
jury at all so far as the mental capacity of the deceased was con-
cerned, depending as it clearly did upon testimony which is always
unsatisfactory and must, therefore, be looked upon with suspicion.
What Mr. Justice FOLLETT said in *Dobie* v. *Armstrong* (27 App.
Div. 520; affd., 160 N. Y. 584) still holds good: " The experience
of the courts has demonstrated that the answers of experts, though
honestly given, to hypothetical questions, embracing pages of
assumed and isolated facts covering a long lifetime, about which
facts the experts have no personal knowledge, are · the weakest
and most unreliable kind of evidence in respect to the sanity or
insanity of the person inquired about." See, also, *Matter of Eno*
(196 App. Div. 131) and *Matter of Loehr* (187 id. 957), where the
court, through JENKS, P. J., writing the opinion, says: " The
testimony of decedent's neighbors, and in particular his directions
to the draftsman of the will, show intelligent comprehension of
his acts. There are experts who reach different conclusions based
on hypothetical questions. Against evidence of testamentary
capacity, the contrary opinions of experts based on a hypothetical
statement scarcely raise an issue. (*Pettit* v. *Pettit, No. 1,* 149
App. Div. 485, 491.)"

In the *Pettit* case, referred to by Mr. Justice JENKS, we have a

situation somewhat akin to the case under consideration. It will be recalled that Mrs. Burnham at the time that her will was executed stated that the document was not entirely satisfactory to her, and that she intended when she got well to make another. In the *Pettit* case, Mr. Justice McLaughlin, writing for the First Department in 149 Appellate Division, 485, 490, says: " Leaving out of consideration the testimony of the medical experts based upon the hypothetical question, I am of the opinion, assuming all of plaintiff's evidence to be true, it did not justify the jury in finding that the testator did not have testamentary capacity at the time the will was executed. He * * * knew what property he had and took charge of it; knew he wanted to make disposition of it by will, and after making it discussed making another because he was not entirely satisfied with the one he had made. One who has such intelligence has testamentary capacity (*Delafield* v. *Parish*, 25 N. Y. 9; *Matter of Martin*, 98 id. 193; *Dobie* v. *Armstrong, supra; Ivison* v. *Ivison*, 80 App. Div. 599), and the proof of experts based upon a hypothetical question in opposition to proof showing such intelligence, scarcely, if at all, raises an issue for a jury." (See, also, *Hawke* v. *Hawke*, 82 Hun, 439; affd., 146 N. Y. 366; *Philips* v. *Philips*, 77 App. Div. 113; affd., 179 N. Y. 585; *Matter of Goodhart*, 173 App. Div. 256; *Matter of Bogardus*, 198 id. 399; *Dobie* v. *Armstrong*, 27 id. 520; affd., 160 N. Y. 584.)

Two other points are raised by the counsel for the proponents, in which it is claimed that the learned surrogate committed error. One is that the court erred in denying to counsel for the proponents the right to make the closing address to the jury; and the other is that the court erred in excluding the evidence of Dr. White and the nurse, Miss Bender, concerning conversations carried on by Mrs. Burnham with these witnesses a few hours after the execution of the will in question.

So far as the first point is concerned, I am inclined to think that the learned surrogate was entirely too strict and technical in his ruling denying to counsel for the proponents the right to make the closing address to the jury; however, the ruling is not of sufficient importance to warrant discussion or justify a reversal here where we are considering the merits of the controversy.

The second ground of objection, however, is more serious, as the conversations between the doctor and the nurse and Mrs. Burnham, immediately before and after the operation from the effects of which she died, were clearly competent, and they should have been admitted, because conversations of a testator subsequent to or about the time of the execution of a will are always admissible to show the condition of mind; and obviously the conversations

in the instant case were not remote enough to justify their exclusion. But, however, since the judgment is to be reversed upon the main and substantial grounds in this case, it will be unnecessary to discuss these points further.

I am not unmindful of the rule in cases of this kind that if there be more than a scintilla of evidence tending to show incompetency to make a will, and of such a character that different inferences may fairly be drawn therefrom, the case must be decided as one of fact; and if the trial be before a jury, must be left to the jury (*Hagan* v. *Sone*, 174 N. Y. 317); but in my judgment such a rule has no application to the present case.

The testimony of the subscribing witnesses to the will was in no way discredited or impeached; and because of the fact that they were present and saw the testatrix at the time the will was executed, they had, of course, a better opportunity to observe and more reliable sources of information regarding her condition or whether or not she possessed testamentary capacity than witnesses who never had seen her.

This will was executed with an observance of all the forms of law required. (Decedent Estate Law, § 21.) It was duly executed and should be probated unless it was not the will of a competent testator. (*Matter of Dunn*, 184 App. Div. 386, 391.) These subscribing witnesses and the other witnesses produced by the proponents upon the trial, to my mind fully established the mental capacity of the testatrix at the time she executed the will in question.

Against this array of proof there is absolutely nothing in the case except the testimony of the two medical experts called by the contestants. Their testimony is unsatisfactory, entirely hypothetical and unsupported by the other evidence in the case; hence such so-called evidence raised no question of fact for the jury. The function of a jury is to pass upon disputed questions of fact, even in will cases. It is not their province to attempt the unlawful and improper business of making wills for other people and disposing of their property in the way the jury thinks such wills should be made. The verdict of the jury that the decedent lacked testamentary capacity is against the evidence and the weight of the evidence, and should be set aside, under the rule laid down in the following cases: *Delafield* v. *Parish* (25 N. Y. 9); *Matter of Snelling* (136 id. 515); *Matter of Wolf* (196 App. Div. 722); *Matter of Case* (214 N. Y. 199), and *Matter of Heaton* (224 id. 22).

The decree of the Surrogate's Court refusing probate and the order denying the motion for a new trial should be reversed, with costs to the executors, appellants, payable out of the estate, and the

matter remitted to the Surrogate's Court, with directions to admit the will to probate, with costs to the executors, appellants, payable out of the estate.

BLACKMAR, P. J., KELLY, KELBY and YOUNG, JJ., concur.

Decree of the Surrogate's Court of Westchester county refusing probate and order denying motion for a new trial reversed, with costs to the executors, appellants, payable out of the estate, and matter remitted to said court, with directions to admit the will to probate, with costs to the executors, appellants, payable out of the estate.