Foster, J.
This is an appeal by contestants from an order of the Surrogate of Albany County directing the probate of an instrument purporting to be the will of Thomas Horton, deceased. In a contested probate proceeding the jury failed to agree, and the Surrogate directed probate, holding that there was no evidence of fraud, duress or undue influence in the execution of the will and that the evidence adduced was insufficient to establish lack of testamentary capacity.
Horton died on May 3, 1945. The testimony varies as to his age at the time of death but apparently he was in his late seventies. The will in question was executed April 21,1945. Decedent left him surviving three brothers, Alexander, George and William, two nephews and two nieces. The value of his estate was estimated at approximately $84,000. By the terms of his will, and after some specific bequests to others, he left his brothers and nieces the sum of $5 each, and he stated these legacies to be “ in view of the fact that I have from time to time contributed to each of them various sums of money which they have not repaid; and, provided that he shall neither contest nor resist the probate of this document as my Last Will and Testa *648 ment, nor present any claim against my estate, I direct my executor hereinafter named to deliver to each of my said brothers., respectively, for cancellation without payment, each and every promissory note of his which I may hold at the time of my death * * His residuary estate he left to Evans W. Amidon, and his wife, L. Pearl Amidon, jointly, or to the survivor of them should either predecease him. The Amidons were not relatives but friends with whom he resided at the time of his death." There is little evidence as to hoiv and when his attachment to the Amidons became formed, but there is some proof to the effect that they had been friends for a number of years.
Decedent’s will was drawn by an experienced attorney of many years practice, who acted as one of the attesting witnesses. He had drawn another will for the decedent the year before. This attorney testified, from recollection and the aid of notes, in great detail and particularity as to his interviews with decedent preliminary to the drafting of the instrument in question. He also expressed the view that the remarks of decedent were perfectly rational and that he was alert mentally. In framing the design of his will decedent gave specific and clear instructions for each bequest, and explained the apparent antipathy he had toward his brothers. In one interview with his attorney he characterized them as ‘ ‘ three burglars ”.
The other attesting witness was an insurance agent who had written various insurance policies for decedent for some twenty years. He also testified that in his opinion decedent was competent mentally.
Contestants produced four lay witnesses and one physician, who testified generally to the effect that in their opinion the decedent was irrational at the time-his will was executed. Of the lay witnesses one was a woman who had been his housekeeper. She was clearly hostile to the Amidons and declared that if they stayed with the decedent she would not. She testified as to what appears to have been a trivial dispute over a watch formerly owned by decedent’s wife, and said that decedent’s conduct on that occasion impressed her as irrational. Another-witness operated a garage and he testified that decedent’s conduct in leaving his wallet and gas coupons at the garage after he had purchased gas on two occasions impressed him as being irrational. Another acquaintance of decedent testified that the conduct of the latter some time in April, 1945, impressed him as being irrational because when he spoke to decedent as the latter was getting out of a car and-approaching a sidewalk, the decedent failed to give any sign of recognition. An accountant *649 who had done work for decedent, including making out his income tax returns for a number of years, said that his conduct impressed him as being irrational because he asked to have the same computations made over again.
A physician called by contestants had treated decedent from March, 1943, until his death on May 3, 1945, except as to treatment administered at decedent’s home. This was taken care of by another physician who acted as an assistant to the witness, and who did not testify on the trial. According to this witness decedent suffered from markedly high blood pressure, prostate hypertrophy and general arteriosclerosis, particularly cerebral sclerosis. His heart action was poor and this condition required the use of digitalis at times. In May, 1943, decedent’s prostate gland was removed and after this operation he appeared to make a good recovery. Some time after that, however, his condition grew progressively worse, and at times he became emotionally unstable. On April 3, 1945, his heart condition became worse and on the 24th of the same month he showed a complete breakdown. On April 29th, he was taken to a hospital where he remained until he died on the 3d day of May. This witness expressed the opinion that decedent was not competent on the 21st day of April when he executed the instrument purporting to be his will. According to the diagnosis by this physician decedent’s mental incapacity was due to cerebral sclerosis and he was suffering in this connection with a condition commonly known as senile dementia.
As against this testimony adduced by contestants, and in addition to the testimony of the attesting witnesses, proponents brought to the witness stand at least thirty persons, friends, acquaintances, business associates and several attorneys, who related conversations and transactions with the decedent which took place very close to the time the will was executed, and all of whom swore that decedent’s conduct was rational. So far as may be told from the record all of these witnesses were disinterested. Moreover it was shown beyond dispute that decedent engaged in several business transactions during March and April of 1945, in the course of which he showed considerable sagacity and bargaining capacity. For instance he sold a house to the Bell family on April 27, 1945. He was first offered the sum of $5,000 for this property but declined to sell for less than $8,500, and the deal was finally closed on his terms. Two attorneys Avere present at this transaction and both testified that he Avas rational. On April 16, 1945, he completed, at the National Commercial Bank, another transaction for the sale of another *650 house. He demanded a certified check for the purchase price, and signed a check himself for a broker’s commission. There were present at this transaction several persons, including an attorney, who said that his conduct was rational, and this was only five days before the will in question was executed. Space does not permit a complete analysis of all the testimony on this side of the case, but suffice it to say that it overwhelmingly refutes the claim of mental incapacity. There was proof also that decedent had had considerable trouble with his brothers, even to the extent of engaging in litigation with them, and that his feeling against them was a matter of realism and not the result of whim or caprice.
The question at issue is whether the Surrogate had power under the circumstances disclosed to direct a probate of the will after the jury had disagreed. Contestants’ chief point is that they produced some testimony as to decedent’s lack of testamentary capacity and that, therefore, they are entitled to a jury trial as a matter of right. The Surrogate assumed to direct probate under section 457-a of the Civil Practice Act, which provides generally that a judge may direct a verdict when he would set aside a contrary verdict as against the weight of evidence. Although a jury trial in a contested probate proceeding is not a matter of constitutional right, it is nevertheless given by statute (Surrogate’s Ct. Act, § 68); and we agree that if upon all the evidence a real question of fact is presented the contesthnt should be permitted to have a jury pass upon the issue of competency. We think perhaps there may be a distinction between the power of a trial court to direct a verdict in a case where the parties have a constitutional right to a trial by jury (Blum v. Fresh Grown Preserve Corp. 292 N. Y. 241), and the power of a surrogate to direct a verdict in a probate proceeding where no constitutional right of trial by jury is involved (Matter of Eno, 196 App. Div. 131; Matter of Burnham, 234 N. Y. 475; Matter of Fahrenbach, 261 App. Div. 43, affd. 285 N. Y. 763). After all it is the ultimate responsibility of a surrogate to satisfy himself , that a will has been validly executed by a person competent to ¡ make it before he may admit the same to probate (Surrogate’s ! Ct. Act, § 144). But we are not called upon in this case to • discuss such a distinction, if one exists, for in our view the evidence adduced by contestants on any of the objections posed was insufficient to create issues of fact requiring submission to a jury. Some evidence was not enough. Evidence insufficient to convince a reasonable mind amounts to no evidence as a matter of law (Matter of Case, 214 N. Y. 199). The testimony of con *651 testants ’ lay witnesses was too. trifling in our judgment to sustain fraud, undue influence or lack of testamentary capacity; and the opinion testimony of the physician called by contestants was entirely belied by clear and convincing testimony as to conduct and acts on the part of the decedent that established his mental competency at the time he executed his will. Whatever may be ordinarily thought of the worth of a medical opinion, where it is contradicted by the facts, the facts must prevail (Matter of Burnham, 201 App. Div. 621).
The resettled order and decree appealed from should be affirmed, with separate bills of costs to the proponents and residuary legatees, payable out of the estate.