MICHAEL LE GLAIRE, as Administrator of the Estate of SHUSH-ANNA LE GLAIRE, Deceased, Respondent, *v.* NEW YORK LIFE INSURANCE COMPANY, Appellant.

First Department, June 2, 1959.

*Harry F. X. Hammer* of counsel (*Lee M. Gammill*, attorney), for appellant.

*Irwin R. Karassik* of counsel (*Arnold B. Elkind* with him on the brief; *Du Bow, Turk & Roberts*, attorneys), for respondent.

RABIN, J.   Defendant appeals from a judgment in the sum of $14,322.60 entered on a jury verdict in an action founded on a claim for double indemnity under two policies of life insurance issued by defendant on the life of decedent George Le Glaire.   The double indemnity clause was the usual one and provided for payment on that basis should death result solely from accidental means " directly, and independently of all other causes ".   Thus if illness or disease contributed in any way to death there could be no recovery under the accident clause.

The decedent, a Chicago resident, was just short of 54 years of age at the time of his death.   For some time previous, and prior to his application for insurance, he had been suffering from stomach distress and so-called heartburn and was being treated by his family doctor for what was considered to be a duodenal ulcer.   Although it is of no significance, insofar as the right to recovery in this case is concerned, it may be noted that decedent at the time he applied for insurance did not disclose this medical history.

Decedent was an active man in business and indulged to a considerable extent in athletics, playing tennis in the summertime and ice skating in the wintertime.   On the day of his death (Dec. 19, 1951) he went to an ice-skating rink located in Chicago.   At approximately 10:30 P.M. he was observed leaving the ice and proceeding on his skates across a rubber mat towards rinkside chairs.   As he was turning and about to sit on a chair he fell to the floor with his hands outstretched in front of his head.   In falling, his face was injured in the vicinity of the right cheekbone.   He then rolled over on his back, was unconscious and gasping for air.   His color had turned from pale to " blueish gray ".   Within a few minutes he was carried to a first aid station in the rink and shortly thereafter was taken to a hospital nearby.   Upon arriving at the hospital preliminary examination revealed no sign of life.   After oxygen and artificial respiration had been administered for about an hour he was declared dead by a young resident physician named Roach.

Doctor Roach testified by deposition that prior to the administration of the oxygen, upon palpating the decedent's neck, he discovered that the larynx had dropped some two or three inches and was resting on the upper edge of the breastbone and that he manipulated it back into its proper position.   This

led him to make a note in his report that decedent's larynx was "dislocated and or [sic] avulsed". He testified however that this was an impression rather than a diagnosis. Doctor Roach found no bruises, abrasions, ecchymosis or other marks on the decedent's neck.

Doctor Feeney, another young resident at the hospital, testified that he was in the emergency room for a few minutes and saw the decedent. When asked what he had observed he said, "Well, it is a little bit hazy now; I haven't thought of it, but as nearly as I can recall, he had an avulsed larynx and trachea; it was pulled loose and pushed down."

Based upon the testimony of these young resident doctors, a Doctor Frick, in response to a hypothetical question, which assumed an avulsion of the larynx, expressed the opinion that the cause of decedent's death was asphyxiation. In addition, this doctor also advanced the theory that plaintiff in falling and striking his head could have sustained an injury to the carotid sinus process, thus paralyzing the heart and causing death. Still another theory was offered by plaintiff's witness Doctor Conner. He stated that in the case of a person who had a "pipe stem coronary with occlusion" a fall such as that sustained by decedent could result in a drop in blood pressure which would "compromise his coronary circulation" and could result in death. Apart from the mere advancement of these two additional theories there was no proper evidence offered which would permit the jury to base the cause of death on either theory. Plaintiff's medical witnesses did not say that death was caused by an injury to the carotid sinus process or by a sudden lowering of blood pressure. They merely stated that those were things that could cause death.

In substance, therefore, while plaintiff's medical testimony was that decedent died of asphyxiation caused by an avulsion of the larynx, it also indicated that death could result from the carotid sinus process or drop in blood pressure.

The contention of defendant is that death was caused by heart disease, culminating in coronary occlusion. To support that contention there was offered and received in evidence the official report of the autopsy which was made on decedent the day after death. Therein, Doctor Carter, a coroner's physician, stated that in his opinion decedent's death was caused by coronary occlusion. In the specific findings the report contained a notation of an abrasion over the right cheek and right eye. There was no evidence of any other injury or trauma. With respect to the heart there was "Marked Arteriosclerosis with

pipe stem coronary with occlusions.'' Dr. Carter amplified his findings in his deposition. He stated that he had made a complete autopsy examination. He found no marks, abrasions, ecchymosis, or bruises on the surface of the skin of the neck; the condition of the larynx, which he examined, was normal, there was no evidence of trauma and there was no hemorrhage or indication that any of the vessels connected with larynx had been torn.

Doctor Milton Helpern, Chief Medical Examiner for the City of New York, testified for the defense. He expressed the definite and unequivocal opinion that decedent died of '' occlusive coronary arteriosclerosis.'' In answer to a question as to whether, on the facts detailed, decedent could have suffered an avulsion of the larynx, he stated: '' I would say that that is impossible. I would say categorically that a fall of the type you mentioned could not produce an avulsion of the larynx under any circumstances.'' He was quite emphatic in his view that in order for there to be an avulsion of the larynx there would have to be a blow or injury so severe as to sever the larynx and pull it down into the neck and that any such injury would be clearly evident. As indicated however, Dr. Carter's testimony was that the autopsy revealed no evidence of tearing or severance of the larynx, nor was there any mark on the surface of the neck skin which would indicate any blow or injury to that area. Plaintiff's own witness, Dr. Roach, also had found no marks of any kind on the decedent's neck.

Of course it was for the jury to determine the cause of death. The Trial Judge, while properly instructing the jury that in order to bring in a verdict for plaintiff they must find that death was caused solely by accidental means, nevertheless placed squarely before the jury the three different theories advanced by plaintiff, thereby permitting the jury to find that death might have been caused by (1) avulsion of the larynx, (2) injury to the carotid sinus process or (3) a sudden drop in blood pressure. Although requested by defendant to have the jury bring in special findings as to the cause of death, such request was refused. As indicated the jury found for plaintiff but there is no way of knowing on what theory.

We are of the opinion that the judgment must be reversed and a new trial ordered for the reason that there was no evidence whatever to support a finding that death was caused by either of the latter two theories offered by plaintiff. Those theories, purely speculative, should not have been submitted to the jury at all. Since it is possible that the jury may have

based their verdict on either of those theories (for which there was no support in the evidence) the verdict must be set aside (*Clark* v. *Board of Educ.*, 304 N. Y. 488; *Kawczynski* v. *Prudential Ins. Co. of Amer.*, 244 App. Div. 759; *Pettit* v. *Pettit*, 149 App. Div. 485).

If perchance the jury found that decedent's death was caused by an avulsed larynx, then too we feel impelled to set aside the judgment because we consider such a finding to be clearly against the weight of the credible evidence. It would seem to completely disregard the strong, and indeed conclusive evidence, that the decedent had a serious heart condition which, if it was not the direct cause of death, at least must have been a contributing factor. Decedent's medical history, the details of his sudden collapse with quickly ensuing death, the autopsy finding of marked arteriosclerosis and coronary occlusion — all point with certainty to the fact that decedent had a bad heart condition which must have played some part in his sudden death.

The uncertain and unconvincing testimony of Dr. Roach and Dr. Feeney with respect to an avulsed larynx falls far short of the proof necessary to support a finding of death resulting solely from accidental means. It is clearly and heavily outweighed by the positive testimony of Dr. Helpern who stated that in the circumstances of this case there could not have been an avulsion. Taking into consideration also, the serious heart condition revealed by the autopsy, it can hardly be said that plaintiff sustained his burden of proving that death resulted solely from accidental means.

We conclude therefore that there must be a new trial, first, because the jury may have reached its verdict based upon a theory unsupported by evidence and secondly, because the verdict in plaintiff's favor is against the weight of the credible evidence.

The judgment should be reversed on the law and on the facts and a new trial ordered, with costs to defendant-appellant.

Breitel, J. P., M. M. Frank, Valente and Stevens, JJ., concur.

Judgment unanimously reversed upon the law and upon the facts and a new trial ordered, with costs to appellant.