In the Matter of the Probate of the Will of FRANK BENNETT, Deceased.

THEODORE BENNETT and Others, Appellants; ANNA BARBARA BENNETT, Respondent.

Second Department, December 7, 1923.

**Wills — probate — no issue of fact as to publication — direction of verdict in favor of proponents was proper.**

In proceedings to probate a will in which it was contended that the will was not properly published, the evidence shows that no real issue of fact as to the publication of the will was presented and, therefore, the direction of a verdict by the surrogate in favor of the proponent was proper.

KELBY, J., dissents, with opinion, in which KAPPER, J., concurs in part.

APPEAL by Theodore Bennett and others from a decree of the Surrogate's Court of the county of Kings, entered in the office of said Surrogate's Court on the 20th day of September, 1922, upon the verdict of a jury rendered by direction of the surrogate, admitting to probate the will of Frank Bennett, deceased.

*Thomas J. O'Neill* [*Adolph Ruger* and *Leonard F. Fish* with him on the brief], for the appellants.

*Herbert T. Ketcham,* for the respondent.

PER CURIAM:

We think that the evidence presented no real issue of fact as to the publication of the will. (*Matter of Burnham,* 201 App. Div. 621; affd., 234 N. Y. 475.) Therefore, the surrogate properly directed a verdict.

KELLY, P. J., MANNING and YOUNG, JJ., concur; KELBY, J., dissents, and reads for modification; KAPPER, J., concurs with KELBY, J., for modification, and for a new trial, upon the ground that the evidence presented a question of fact as to the due execution of the will, but does not regard the constitutionality of section 457a of the Civil Practice Act* as involved in such determination.

KELBY, J. (dissenting):

The appeal in this proceeding was entered after a second trial before the surrogate and a jury. Upon the former trial the surrogate directed a verdict in favor of the proponent upon the litigated questions of testamentary capacity and undue influence, and submitted to the jury, for their determination, the sole question of the due execution of the will. The jury found that the will was not duly executed, and a motion was made to set aside the verdict. This was denied at the close of the trial, but upon reargument it was granted and a new trial ordered. The order granting a new trial was directed to be solely upon the following question:

"Was the paper writing of date May 3, 1919, propounded by the petitioner herein as the Last Will and Testament of Frank Bennett, deceased, duly executed?"

The contestants appealed from that order which was unanimously affirmed by this court. (201 App. Div. 860.)

Upon the trial now under review, at the close of the evidence, the proponent moved for the direction of a verdict that the will was duly executed. The surrogate reserved decision upon the motion and submitted the sole litigated question to the jury, and the jury again found that the will was not duly executed. There-

---

* Added by Laws of 1921, chap. 372.— [REP.

after the surrogate heard counsel on a motion to set aside the verdict as against the weight of evidence, and also upon the motion for the direction of a verdict that the will was properly executed. From the decree entered upon the surrogate's decision directing a verdict for proponent, the contestants now appeal.

The will admitted to probate was found to have been made on May 3, 1919. Contemporaneously with the making of the will of Frank Bennett there was also made the will of his wife, Anna Barbara Bennett, the petitioner herein. Both papers were drawn by Mr. George M. Schinzel, who supervised their execution, and who was a subscribing witness to both.

Mr. Schinzel had been the attorney of Mr. Bennett for over twenty years prior to the drawing of the paper in question, and had been his personal friend. On May 3, 1919, Schinzel had been attending to some tax matters for Mr. Bennett in Staten Island and he had an appointment to call at Mr. Bennett's house. Before Schinzel actually made the call, Mrs. Bennett called him up on the telephone and said that Mr. Bennett desired him to bring up a couple of blank wills. Schinzel thereupon attended at the home of Mr. Bennett and first transacted with him the business connected with the Staten Island property. That transaction and the following transactions relating to the alleged wills of Mr. and Mrs. Bennett all took place in the kitchen of the Bennett household. The business connected with the Staten Island property occupied about half an hour. Testifying as to what followed, Schinzel said: " I then took these two blanks out of my pocket. * * * I said: ' Now, what about these? ' Mrs. Bennett said: ' Frank and I want to make joint wills giving our property to each other.' And I said: ' Is that right, Frank? ' He said, ' Yes.' " Schinzel then sat down and started to draw Frank Bennett's will, using one of the blanks he had brought with him. There was nobody present at that time except Mr. and Mrs. Bennett. Schinzel said to Bennett: " Are there any special bequests? " Bennett replied: " I want to leave something to the church." Schinzel said: " All right; how much? " Then appears the following testimony: " And Mrs. Bennett said: ' No, I will take care of that.' Frank then said: ' Well, you want me, or rather you want it provided in your will that I shall pay the church a certain amount of money but you don't want me to put it in my will. You want me to leave it to you.' And she said: ' I will take care of it.' So I then proceeded to draw this paper and when I arrived to the matter of the executor I said: ' What about executor, Frank? ' And he turned to Mrs. Bennett and said: ' What about making Jake an executor with you? ' And she said: ' I don't want Jake. Why

App. Div. 388]        Second Department, December, 1923.

should I have him?' He said: 'He is a business man and could help you or advise you and you could go to him for advice.' And she said: 'No, I want to be executor alone. If I want any advice I will go to him for the advice.' He then turned to me and said: 'All right, George, go ahead and let her have it her way,' or words to that effect, * * *. I then proceeded to finish the paper. * * * Q. You drew it at that time in accordance with what had been told you by Mr. Bennett? A. And by Mrs. Bennett, both. I then took up the other paper which is marked 'The last will and testament of Anna Barbara Bennett,' and I proceeded to draw that also and I drew that in accordance with the directions given me at the time. Q. By whom? A. By Mrs. Bennett and Mr. Bennett, both together. Q. Mrs. Bennett told you how to draw her will? A. Yes, she did. Q. All right. A. I then drew this up and said: 'What about witnesses?' Mrs. Bennett says 'Do witnesses have to know what is in the paper?' I said: 'No, they do not.' She then said: 'Well, can my mother act as a witness?' And I said: 'Yes, but I would prefer to have outsiders.' She said: 'Then I will call mother or Mom.' I think she used the word Mom — I am not quite certain on that, and she went to the dumbwaiter and pulled the rope; that is, shook the rope, and called to her mother upstairs to come down. * * * Q. Well, then, what took place when her mother came down? That is all that happened until the mother came down? A. No. Q. What happened after she called her mother? A. While Mrs. Bennett was at the dumbwaiter, calling her mother, Frank spoke to me very crossly. Q. What did he say to you? A. He said: 'I will sign this paper to humor her. I want Jake as an executor. I will be at your office in a day or two and make a will appointing Jake as executor.' Q. That is all that he said on that subject? A. At that time." Mrs. Bennett came back from the dumbwaiter and again seated herself at the kitchen table. Her mother, Mrs. Nelle, then entered the kitchen from the hallway. "Q. Was anything said between you and him [Bennett] with respect to making the will or how to make the will after Mrs. Bennett came back from the dumbwaiter and before Mrs. Nelle came in? A. Nothing. * * * Q. When Mrs. Nelle came in what took place? Q. I just said, 'Mrs. Nelle, Frank wants you and me to witness his signature.' And I said, 'Is that right, Frank?' And he said, 'Yes.' * * * Q. And you did not say anything about a will? A. I did not." Schinzel then took from Mr. Bennett the paper he had drawn, folded the first leaf in the middle, shutting out all of the second page except the words "Appointed to be executrix of this my last will and testament," and partially obscuring the

words " I hereby appoint my said wife Anna Barbara Bennett."
He then asked Mr. Bennett to sign the paper, and said to the
other subscribing witness, " Mrs. Nelle, will you sign this as a
witness with me to Frank's signature? " Mrs. Nelle thereupon
signed it " in both places," and then Schinzel signed it. The
matter of Mrs. Bennett's will was then taken up. Schinzel laid
the paper down on the table and said to Mrs. Nelle, " Mrs.
Bennett wants you and I to witness her signature." Schinzel
admits that this was an unusual circumstance and that ordinarily
he would ask the witness whether or not he wanted to sign as a
witness to the will. Schinzel was very familiar with the drawing
of wills; he says that he had drawn three or four hundred before
the transaction of May 3, 1919. He testified that he deliberately
and intentionally left out any question that would have either
Mr. Bennett or Mrs. Bennett declare that the papers signed by
them were their last wills. Schinzel further testified that Mr.
Bennett said he intended to make a will appointing Jake as an
executor, that he was anxious to do that, and that he would be
in in a couple of days to do it — very soon. Upon the former trial
the same witness testified that Mr. Bennett said: " I will sign this
now to humor her, but I will draw *another* will appointing Jake
executor." He testified to this more than once, but later corrected
his testimony so as to have Mr. Bennett say that he would draw
*a* will appointing Jake executor. Nothing at all was said about
Mrs. Bennett coming to Schnizel's office to make another will,
but, according to Schinzel, he also aborted her will by omitting
to have it declared as her will. Each of the wills has a full attes-
tation clause which certifies that the instrument " was declared
by the said Testator [Testatrix] to be his [her] Last Will and
Testament, and each of us, at the request of said Testator [Testatrix]
and in his [her] presence and in the presence of each other, signed
our names as witnesses thereto." Schinzel, who was fully familiar
with attestation clauses, signed this certificate that Mr. Bennett
had declared the instrument to be his last will and testament, and
he says he allowed Mrs. Nelle to sign it also.

Schinzel was the attorney for Mrs. Bennett as well as for Mr.
Bennett in the transactions that day. Mrs. Bennett asked his
advice as to the making of her will. In the course of the conversa-
tion she said she had just gone through bankruptcy and wanted
to know whether that would interfere with her making a will of
the character proposed. Schinzel informed her that it would
not, so long as she had been discharged from bankruptcy.
When the papers were executed, Mrs. Bennett's will at least was
put into an envelope and indorsed: " Last will and testament of

Anna Barbara Bennett." Schinzel thinks he put the other will in a paper and indorsed it; but on objection that the envelope was the best evidence, he was not allowed to say what the indorsement actually was. Schinzel admits that he knew that the attestation clause was untrue when he signed it; that he never thereafter told Mr. Bennett he had made that untrue statement; that this was so as to Mrs. Bennett's will also, and he never told her it was untrue. It was finally admitted by him that he met Mr. Bennett ten or fifteen times after the making of the will — sometimes in his, Schinzel's, office, sometimes at the Bennett home, once or twice in court, and once on a trip to Staten Island. He says that Mrs. Bennett was always present on those occasions. Despite these frequent meetings, neither Schinzel nor the decedent ever spoke of a proposed will naming Bennett's brother Jake as executor. Schinzel never said anything to Bennett about the will, or as to his having aborted the will, although he had been Bennett's intimate friend and his lawyer for twenty years. He admitted that he knew Bennett could make a will every day for the rest of his life. He knew that if the will was probated it would give the estate to Bennett's widow. Schinzel further testified as follows: " Q. Did you therefore realize there was no occasion to make this will no will at all simply because he wanted to make an additional executor? * * * A. I did not have hardly time enough to think out — Q. You knew it, didn't you? A. I knew he could do it, yes. Q. You knew then there was no occasion for making this will bad because of the mere fact that he wanted to have another executor? A. I did not think about that phase of it. Q. But you knew that was so? Mr. O'Neill: Objected to, because it don't make any difference that a man may know a thing upon reflection. The question is whether he thought about it and decided there were other conditions. This man appeared to be under control of the woman altogether. Mr. Ketcham: Objected to; that statement. The Surrogate: Objection overruled. Mr. Ketcham: I ask your Honor to instruct the jury that there is no evidence he was under the control of his wife. The Surrogate: I will so direct. Mr. O'Neill: We except. Q. You may answer. A. I did not think of it at the time." The examination was continued: " Q. You knew it in your soul, didn't you? That there was not any occasion just because he wanted to make a new executor that you should abort his will leaving his property to his beloved wife? A. I knew that, but had I given reflection at the time I might have done differently." He said that as a lawyer he knew it but that he did not think of it. " Q. Did you understand at that time that there was no occasion to make that will a

bad one in the mere fact that he wanted to change his executor? A. I decline to answer the question, Judge. Q. On what ground? A. On the ground it may tend to incriminate me."

After the death of Mr. Bennett, which occurred on November 30, 1920 (the will having been dated May 3, 1919), Schinzel called at the home of the Bennetts, before the funeral. He took away with him the paper offered as the last will and testament of Frank Bennett. Mrs. Bennett gave it to him. There is no suggestion in the record that at that time he intimated to Mrs. Bennett that the will was invalid because he had purposely caused a defective execution of the same. On the contrary, he told her that he would offer it for probate. He took the will to his office and made copies of it, preparatory to filing it. He says that he told Mrs. Bennett he would offer it for probate. The petition for probate was drawn on a typewritten form. It contained words written by Schinzel, and he passed upon it when it was finished. He became attorney of record for Mrs. Bennett as proponent, and he procured a verification of the petition by Mrs. Bennett, in which she was allowed to swear that she was the executrix named in the will of Frank Bennett, deceased; that it was a will, and that it was signed by Schinzel and Mrs. Nelle as witnesses. The petition was verified December 6, 1920, one week after Bennett's death. Schinzel says that he intended to have the will admitted to probate providing there were no objections filed to it. Before it could be admitted to probate, even in default of objections, Mr. Schinzel would have been compelled to sign and swear to a deposition stating that Bennett had declared the paper to be his last will and testament. He had Mrs. Bennett sign and verify an oath of office as executrix. This was filed in the proceeding, and there was also filed a designation of the clerk of the Surrogate's Court as the person upon whom service was to be made on behalf of the executrix. This concededly was done on behalf of Mr. Schinzel as attorney in the case. Schinzel then told Mrs. Bennett that he thought he could get waivers of the issuance of citation. He told his clerk, a man named Corr, that he wanted to get waivers, if possible. At that time, when he was trying to get the waivers, he intended to prove the will if there were no objections. He tried to get them before the petition for probate was filed, and he tried for a week or ten days thereafter. He says he directed his clerk, Corr, not to file the petition for probate for a little while. The petition was filed, however, and the citation issued, and Schinzel appeared in court. Objections were filed two days before the return day.

Thereafter Schinzel said he could not act as attorney any longer, and Mr. Jetmore became attorney for the proponent.

Schinzel recalls that he had testified that he told Mr. Jetmore he did not know what any of the objections could be based upon. He said it was possible that he told Mr. Jetmore he did not know of any objections, but he had no recollection of having said so in those words. Thereafter appears the following: " Didn't you tell him you did not know what any of these objections could be based on [referring to the objections filed]? A. I think I testified I may possibly have done so. Q. Didn't you testify today you told him that? A. Yes, sir." He says he thinks he told Mr. Jetmore, the second time he saw him at his office, that the will was not published. That, he thinks, was some time in January. He did not tell Jetmore of the lack of publication before that, though he knew of it all the time. " Q. Did he [Jetmore] then ask you whether you and Mrs. Nelle had signed the depositions? A. Yes, I think he did ask me whether I had signed the depositions. Q. Did you then say you did not know whether you had or not? A. I think I so told him."

At seven separate places in the record Mr. Schinzel refused to testify on the ground that his answer might tend to incriminate him; the transactions about which he was then being examined having no relation to the making of this will. On six occasions he refused to testify on the ground that his answer might tend to incriminate him with respect to matters which were immediately relevant to the transactions, three times with regard to what he said on the former trial, and three times with regard to the disclosure of professional confidences.

As against Schinzel's testimony, the other subscribing witness, Mrs. Nelle, testified that the paper offered for probate was signed by Bennett in her presence. She testified that Bennett was reading the will and he said: " All right, George," and that Mr. Schinzel said: " All right, Frank? " and Bennett said: " Yes." Schinzel then said: " Do you acknowledge this as your last will and testament? " and Bennett said: " Yes." " Q. At the last trial when you swore he had $6,500 in the bank and he gave it to you in trust for your daughter, you knew that that was not true at all, didn't you? A. Yes."

This testimony about the $6,500 was apparently given by Mrs. Nelle to offset the claim that her daughter, having recently gone through bankruptcy, had nothing at all to dispose of by will.

Mr. Jetmore testified that he first met Schinzel on December 20, 1920, and that he asked Schinzel what the contest in the case could be based on. " Q. Did he then say in reply to that that everything was regular about the execution of the will? * * * A. He did." He further testified that in substance Schinzel said

he had no idea what the contest could be based upon; that the wills were drawn by him in accordance with the direction of the parties; that each of the parties read his or her will and said it was all right; and that each of them declared the same to be his or her last will and testament in the presence of the witnesses, who signed at their request. " Q. Did he at that time say that he was very careful of this will and that while he may have overlooked some formality in other wills, these wills were strictly in accordance with the requirements of the law, or words to that effect? * * * A. Yes, sir. Q. Did you at that time and place ask him whether or not he and Mrs. Nelle had signed the deposition? A. Yes, sir; in substance. Q. Did he at that time and place in reply thereto say that he did not know but that he was going by the Surrogate's Court and would find out and let me [you] know, and that if he had not made the deposition he would do so? A. Yes, sir." It appears also by Schinzel's own testimony, supplemented by that of Mr. Jetmore, that Schinzel told Jetmore he had learned that the contestants had sent for some of his clients and were prepared to attack his character if he should be a witness for the proponent; that Jetmore said: " Is there any truth in these things? " and that Schinzel replied in effect that there was just enough truth in them to make them appear bad. Schinzel had also acted as lawyer for the brothers and sisters of Mr. Bennett at different times for the last ten or fifteen years. Schinzel had professional relations with every one of the contestants after the making of the will and during the remainder of Mr. Bennett's life, and since the death of Mr. Bennett he had acted as counsel for four of the heirs at law.

From the statement of facts above given, it satisfactorily appears that the surrogate did not abuse the discretion vested in him by granting the motion to set aside the verdict.

A point urged by the appellant is that the surrogate had no power to direct a verdict under section 457a of the Civil Practice Act (as added by Laws of 1921, chap. 372), because that section is unconstitutional.

The learned surrogate in his opinion says: " Section 457a of the Civil Practice Act provides that ' a judge may direct a verdict when he would set aside a contrary verdict as against the weight of evidence.' It was earnestly argued by counsel for the contestants that this provision is unconstitutional, but inasmuch as the question thus presented will no doubt be argued in the Appellate Division, the Surrogate presiding thinks a court of first instance will assume the validity of the legislation. It was for the purpose of obtaining a jury's verdict that might be reinstated upon the

appeal if the trial court erred in directing the verdict, and thus avoid the necessity of a retrial, that the Surrogate submitted the question as to due execution to the jury."

Section 457a of the Civil Practice Act refers to Surrogates' Courts as well as to the Supreme Court. The 1st section of the Civil Practice Act provides: " This act shall be known as the Civil Practice Act, and, except as otherwise expressly provided, shall apply to the civil practice in all the courts of record of the State." In section 62 of the Civil Practice Act it is provided that the courts referred to in the act are enumerated in sections 2 and 3 of the Judiciary Law, and section 2 of the Judiciary Law, enumerating the courts of record of the State, includes within it the Surrogates' Courts.

The Surrogate's Court Act (Laws of 1920, chap. 928, as amd.) was enacted on the same day with the Civil Practice Act (Laws of 1920, chap. 925, as amd.), and section 316 of the Surrogate's Court Act (as amd. by Laws of 1922, chap. 653) provides: " Except where a contrary intent is expressed in, or plainly implied from the context of this act, a provision of law or of rules, applicable to practice or procedure in the Supreme Court, applies to Surrogates' Courts and to the proceedings therein, so far as they can be applied to the substance and subject matter of a proceeding without regard to its form."

It is argued by the contestants that this statute offends article 1, section 2, of the Constitution, which provides: " The trial by jury in all cases in which it has been heretofore used shall remain inviolate forever." This was a re-enactment of similar provisions in prior Constitutions. The last Constitution was amended and revised generally in 1894, and went into effect on January 1, 1895. Prior to January 1, 1895, litigants could always question the validity of a will disposing of *real property* by commencing an action in ejectment, or the heirs at law could maintain an action at law under section 1537 of the Code of Civil Procedure. Pursuant to sections 2647 to 2653, inclusive, of the Code of Civil Procedure, persons interested in the estate of the decedent could also, within one year after probate, apply by petition to the surrogate for a decree revoking the probate of the will, and thereby question the validity of the will. (See Laws of 1880, chap. 178; Laws of 1881, chap. 535.) Section 1016 of the Civil Practice Act (re-enacting Code Civ. Proc. § 1537) now provides that heirs at law may bring an action for the partition of the real property of the decedent, alleging that the devise in the will is void. Prior to 1892 the decree of the surrogate was conclusive as to personal property disposed of by will, and was practically presumptive evidence only

of the validity of the disposition of the testator's real property. (See Code Civ. Proc. [Laws of 1880, chap. 178] §§ 2626, 2627, as respectively amd. by Laws of 1882, chap. 399, and Laws of 1881, chap. 535.) By chapter 591 of the Laws of 1892 the Legislature enacted section 2653-a of the Code of Civil Procedure, which was contained in article 2 of title 3 of chapter 18 of the Code relating to revocation of probate. That section provided that any one interested in a will might cause the validity of the probate thereof to be determined in an action in the Supreme Court for the county in which such probate was had, provided such action should be commenced within two years after probate. Section 2653-a of the Code, as enacted in 1892, stood unamended when the Constitution of 1894 took effect on January 1, 1895. It is argued that the contestants had the right on January 1, 1895, under section 2653-a of the Code, to a jury trial upon the issue as to whether or not the will of the testator was a valid one This is not so. In the case of *Lewis* v. *Cook* (150 N. Y. 163) Judge GRAY, writing for the court, held that the section, as it was originally enacted, authorizing an action by a " person interested in a will " admitted to probate in this State, by which the validity of the will and its probate might be established and placed beyond attack by the heirs at law, refers only to a person who was interested in the maintenance of the will, and that the action could not be maintained by one claiming in hostility to it. It was pointed out in that opinion that this was a new remedy given to a person who took under a will, and that it was enacted for the purpose of offering such a person the right to get a decision which would be binding upon the heirs at law. It, therefore, definitely appears that these contestants had no right, at the time that the Constitution of 1894 took effect on January 1, 1895, to the particular jury trial provided by section 2653-a of the Code. The contestants, however, did have the right at that time to commence an action in ejectment, or the action for partition above referred to under section 1537 of the Code. Whatever right they then had under sections 2647 to 2653, inclusive, of the Code of Civil Procedure to petition for the revocation of probate was taken away on September 1, 1910, by the repeal of said sections. (See Laws of 1910, chap. 578, §§ 4, 5.) By chapter 598 of the Laws of 1897 section 2626 of the Code was amended so as to limit specifically the conclusiveness of the probate decree as to personalty by excepting an action brought under section 2653-a of the Code to determine the validity or invalidity of such will. By chapter 578 of the Laws of 1910 the Code was so amended that sections 2626 and 2627 were expressly repealed, and section 2625 was adopted. The latter section read: "A decree admitting a will

of real or personal property, or both, to probate is conclusive as an adjudication of the validity of the will, and of the question determined under section twenty-six hundred and twenty-four of this act, except as in this chapter otherwise provided." The section referred to under the last phrase " except as in this chapter otherwise provided," is section 2653-a of the Code. By that time section 2653-a had been so amended that a contestant or one claiming in hostility to the will could commence such an action. Section 2625 as thus enacted, making the decree of the surrogate conclusive, was construed in *Wadsworth* v. *Hinchcliff* (218 N. Y. 589) as preventing an action for partition alleging a devise of real property to be void under section 1537 of the Code. It was there held that the only remedy then existing was section 2653-a of the Code as amended by chapter 943 of the Laws of 1896 and by chapters 104 and 701 of the Laws of 1897. The only other limited provision for a jury trial in probate proceedings related to the county of New York, and even there the trial was had in a court other than the Surrogate's Court. (See Code Civ. Proc. § 2547, as amd. by Laws of 1886, chap. 119; Laws of 1895, chap. 946, and Laws of 1910, chap. 576.)

By chapter 443 of the Laws of 1914 (amdg. Code Civ. Proc. chap. 18) a new Surrogate's Code was enacted. This was in the nature of a general revision, and was evidently intended by the Legislature to furnish the only law on the subject. This act left out section 2653-a, and by well-known canons of construction it worked, by implication, a repeal of section 2653-a. (See section 178 of Statutes and Statutory Construction as contained in 1 McKinney's Consolidated Laws of New York, 247 *et seq.*) This new revision also for the first time provided for a jury trial in the Surrogate's Court. It first appears as section 2539 of the Code, and reads as follows: " The provisions of this act relating to trial by the court and a jury, or to a motion for new trial, shall apply to Surrogates' Courts and to the proceedings therein so far as they can be applied to the substance and subject-matter of such proceedings without regard to form, but the surrogate shall have no power to set aside a verdict or to grant a motion for a new trial in any proceeding in which the trial took place in a court other than the Surrogate's Court." Section 2538 of the Code contains, among other things, this provision: " In any proceeding in which any controverted question of fact arises, of which any party has constitutional right of trial by jury, and in any proceeding for the probate of a will in which any controverted question of fact arises, the surrogate must make an order directing the trial by jury of such controverted question of fact, if any party appearing in such proceeding seasonably demands

the same. The surrogate in such order must direct that such trial be had either before himself and a jury, or at a Trial Term of the Supreme Court to be held within the county, or in the County Court of the county." (See, also, Laws of 1915, chap. 275, amdg. said § 2538.)

The provision for trial by jury, contained in section 2538 of the Code, now appears as section 68 of the Surrogate's Court Act, and reads as follows, the new part which was added to the Code in 1915 being italicized: " In any proceeding in which any controverted question of fact arises, of which any party has constitutional right of trial by jury, and in any proceeding for the probate of a will in which any controverted question of fact arises, the surrogate must make an order directing the trial by jury of such controverted question of fact, if any party appearing in such proceeding seasonably demands the same, *and in any proceeding in which any controverted question of fact arises, of which any party has, or has not, constitutional right of trial by jury, the surrogate may, in his discretion, make such order without such demand.* The surrogate in such order must direct that such trial be had either before himself and a jury, or at a Trial Term of the Supreme Court to be held within the county, or in the County Court of the county." The 2d paragraph of section 2539 of the Code was changed and is now found in section 69 of the Surrogate's Court Act. It reads: " The provisions of law relating to trial of a civil action by the Supreme Court and a jury, and to a motion for new trial, shall apply to Surrogates' Courts and to the proceedings therein so far as they can be applied to the substance and subject-matter of such proceedings without regard to form, but the surrogate shall have no power to set aside a verdict or to grant a motion for a new trial in any proceeding in which the trial took place in a court other than the Surrogate's Court."

In the report of the Commission to Revise the Practice and Procedure in Surrogates' Courts, the commissioners stated: " Provision is made for trial by jury of any controverted question of fact in the adjudication of which any party has a constitutional right to such trial. This will prevent the multiplicity of trials which may now be had in probate proceedings and permit the surrogate to determine finally all the issues in respect to the validity of a will." (See N. Y. Sen. Doc. 1914, vol. 11, No. 23, p. 1.) The report contains a quotation from the opinion of Mr. Justice FOLLETT in *Bowen* v. *Sweeney* (89 Hun, 359, 366, 367), which was affirmed in 154 New York, 780. Mr. Justice FOLLETT there said: " It is apparent that under our boasted reform procedure a will relating to realty and personalty may be declared

void because of the insanity of the testator, or for any other cause, in respect to one species of property and valid in respect to the other kind of property, upon the ground that the testator was sane, and so there may be two final adjudications, both supposed to be verities, one affirming a will to be valid and the other affirming it to be void. And in case a will relating to realty and personalty is admitted to probate in the Surrogate's Court, and the decision is reversed by the Supreme Court and the issues are tried before a jury, which are found in favor of the validity of the will, upon which an adjudication is entered by the Surrogate's Court decreeing the probate to be valid, the heir may, notwithstanding, retry the question as to the realty, and possibly, as in the case at bar, obtain a verdict and a judgment that the will is invalid. But the remedy for this incongruous and absurd procedure by which judgments diametrically opposed to each other may be recovered in respect to the same will, does not lie with the courts, but with the Legislature."

Apparently, then, the act proposed was believed to meet the vice just discussed. I think, therefore, that the granting of a jury trial in the Surrogate's Court was for the purpose of avoiding multiplicity of suits and was intended to vest in the surrogate and a jury a substitute for the existing right of a common-law jury in actions affecting real property devised by a will. Therefore, the test which would be applied to the constitutionality of section 457a of the Civil Practice Act is the same in this proceeding as would be applied were we reviewing an action in the Supreme Court after a trial by a common-law jury.

I am not unmindful of the decision of this court in *Matter of Burnham* (201 App. Div. 621), affirmed by the Court of Appeals (234 N. Y. 475). In that case this court reversed a decree of the Surrogate's Court of Westchester county denying probate of a will, and directed that the instrument be admitted to probate. This was done on the ground that the evidence was insufficient to submit the case to the jury on the question of the testamentary capacity of the testatrix in that case. This court held that a new trial should not be ordered simply because the surrogate was not asked to take the question from the jury. While it was pointed out in the decision of the Court of Appeals that the power of the Appellate Division to direct judgment *de novo* in probate cases had existed for a long time, the court said: " From the nature of things this power is somewhat restricted by the provisions now made for jury trial in which controverted questions of fact actually arise. The disposition of such questions is for a jury." (Citing

*Hagan* v. *Sone,* 174 N. Y. 317, and *Middleton* v. *Whitridge,* 213 id. 499.) Under the old Code of Civil Procedure (§ 2588) the practice was that when the appellate court (either the General Term or the Appellate Division of the Supreme Court) reversed or modified a decree of the Surrogate's Court in a probate case on questions of fact, the appellate court always directed a new trial before a jury. (See Laws of 1880, chap. 178, § 2588, as amd. by Laws of 1895, chap. 946. See, also, Code Civ. Proc. § 2771, added by Laws of 1914, chap. 443, as amd. by Laws of 1915, chap. 274; Code Civ. Proc. § 2539, as added by Laws of 1914, chap. 443.)

Upon a review of the evidence in the proceeding at bar, it is apparent that there was an issue of fact to be tried. While all of the members of this court disbelieve the testimony of Schinzel that he purposely refrained from having the will duly published, still that question was one of fact for the jury, and his credibility was for the jury. It is conceded that the provisions of section 21 of the Decedent Estate Law as to the execution of a will were complied with, except as to publication. What, then, would be the rule as to the constitutionality of section 457a of the Civil Practice Act were this an action tried in the Supreme Court?

In the case of *Dwight* v. *Germania Life Ins. Co.* (103 N. Y. 341, 358) it was said: "If the proof of a fact is so preponderating that a verdict against it would be set aside by the court as contrary to the evidence, then it is the duty of the court to direct a verdict." To the same effect see *Leinkauf* v. *Lombard* (137 N. Y. 417); *Hemmens* v. *Nelson* (138 id. 517, 529). As pointed out, however, in subsequent decisions, this language was generally used in connection with a reference to the old rule that a mere scintilla of evidence was sufficient to take the case to the jury, and that in the decisions just cited nothing more was intended than a repudiation of that rule. (*Fealey* v. *Bull,* 163 N. Y. 397, 400.) In 1901 the case of *McDonald* v. *Metropolitan St. R. Co.* (167 N. Y. 66, 68) distinctly repudiated the apparent rule laid down in *Leinkauf* v. *Lombard* and other cases (*supra*). In that case the court said: "It was assumed below that the plaintiff's evidence established a case which, undisputed, was sufficient to warrant a verdict in her favor. But the court said that at the close of the defendant's evidence the plaintiff's case had been so far overcome that a verdict in her favor would have been set aside as against the weight of evidence. Upon that alleged condition of the proof, it held that the trial court might have properly submitted the case to the jury if it saw fit, but that it was not required to as the verdict might have been thus set aside. The practical result of that decision, if sustained, is in every close case to vest in the trial

court authority to determine questions of fact, although the parties have a right to a jury trial, if it thinks that the weight of evidence is in favor of one and it directs a verdict in his favor.   *   *   * The result of setting aside a verdict and the result of directing one are widely different and should not be controlled by the same conditions or circumstances. In one case there is a re-trial. In the other the judgment is final. One rests in discretion; the other upon legal right. One involves a mere matter of remedy or procedure. The other determines substantive and substantial rights. Such a rule would have no just principle upon which to rest.

" While in many cases, even where the evidence is sufficient to sustain it, a verdict may be properly set aside and a new trial ordered, yet, that in every such case the trial court may, whenever it sees fit, direct a verdict and thus forever conclude the parties, has no basis in the law, which confides to juries and not to courts the determination of the facts in this class of cases.

" We think it cannot be correctly said in any case where the right of trial by jury exists and the evidence presents an actual issue of fact, that the court may properly direct a verdict. So long as a question of fact exists, it is for the jury and not for the court. If the evidence is insufficient, or if that which has been introduced is conclusively answered, so that, as a matter of law, no question of credibility or issue of fact remains, then the question being one of law, it is the duty of the court to determine it. But whenever a plaintiff has established facts or circumstances which would justify a finding in his favor, the right to have the issue of fact determined by a jury continues, and the case must ultimately be submitted to it."

Later cases in the Court of Appeals, like *Matter of Case* (214 N. Y. 199), have not whittled down this doctrine.

In the case of *Ridgely* v. *Taylor & Co.* (126 App. Div. 303, 304) this court (WOODWARD, J., writing), after noting that the appeal then written in was the third appeal before the court in the same case, said: " Section 2 of article 1 of the State Constitution provides that the ' trial by jury in all cases in which it has been heretofore used shall remain inviolate forever,' language which could hardly be made stronger, and yet, if verdicts founded on sufficient evidence may be continually set aside because the trial justice, or those who pass in review upon the record, happen to differ with the jury as to the weight of evidence, the guaranty is hardly worth preserving in civil actions; the great privilege which those who emigrated to this country from England brought with them ' as their birthright and inheritance, as a part of that admirable common law which had fenced around and interposed

barriers on every side against the approaches of arbitrary power '
\* \* \* is a barren ideality, subject to be overturned at will.
To be inviolate is to be unhurt, uninjured, unpolluted, unbroken.
\* \* \* If the provision of the Constitution is to remain ' inviolate
forever,' it must not be violated either in form or spirit; there can
be no justification where there is evidence to support a proposition,
to continually set aside the verdicts of juries until a jury happens
to be found to agree with the trial court. There is a place some-
where, where the spirit of the constitutional guaranty requires that
the verdict of the jury shall be final; and where there has been a
sufficient number of trials, under fair conditions, so that it cannot
be presumed that the jury has been under the control of passion,
corruption or other improper motives, or has failed to give to the
evidence proper consideration it is the duty of the court to give
effect to the verdict and to end the litigation."

I am of the opinion that section 457a of the Civil Practice Act
is, within the reasoning of the foregoing authorities, unconstitutional.

Cases which have been tried three or four times have come to
this and other appellate courts. Because of the conditions which
surround this trial, the failure of the jury to discriminate between
evidence which was admitted solely for the purpose of impeaching
witnesses, and not as proof of the facts, a new trial of this issue
should be had.

It is proper to pass upon certain questions of evidence which
arose during the trial of this proceeding. Three witnesses were
allowed to testify as to subsequent declarations of the decedent
that he had executed a will. This evidence, I think, was improperly
received. What probative force could it have in any event? If
the testator in the case at bar thought he had made a will, the
fact that he subsequently said he had made a will does not prove
that he had published it as his will. There are *dicta* to the con-
trary. In *Matter of Corcoran* (145 App. Div. 129), relied upon
by the surrogate, it was said, citing *Matter of Kennedy* (167 N. Y.
170), that " Oral statements or declarations of the deceased are
\* \* \* admissible ' to prove the due publication of a written
will.' " In *Matter of Kennedy* (*supra*), which involved the probate
of a lost or destroyed will, the court said: " The oral statements
or declarations of the deceased are still admissible for some
purposes. *They are admitted to prove the due publication of a written
will.* They are also admissible upon an issue with respect to the
mental capacity of a person to make a will, since such declarations
tend to reveal the true condition of his mind with respect to the
subject-matter of the controversy, and have some bearing upon
the question whether a paper purporting to be his will is really

the production of his own mind or of another." This was not necessary to the issue involved in that appeal and is pure *dictum*. The court in the same decision said: " On the contrary, the great weight of authority in this State is to the effect that the declarations of a deceased person are not competent evidence either to prove that he has made a will or to prove the continued existence of a written will, unless made in connection with some act under such circumstances as to become a part of the *res gestæ*, and declarations of the deceased tending to show that a written will has been revoked are open to the same objection, unless they accompany some act which the statute* prescribes as a requisite of revocation, and then they are received as in other cases as part of the *res gestæ*."

In *Matter of Russell* (33 Hun, 271), which was also a proceeding for the probate of a lost will, it appeared that the only evidence on the subject of the execution of a will, aside from proof of declarations of the deceased that he had made a will, was the testimony of a witness that about a year before the death of the testator the witness was present with the testator at a lawyer's office; that on that occasion, in the presence of the testator, the witness saw a paper of four pages, partly written and partly printed, lying on the lawyer's table, which the testator said was his will; that he saw the testator's name and seal at the end of the paper; and that under the testator's name was a space filled with written or printed matter, and under that, at the left hand of the paper, were two or three names, one of which, he thought, was that of the lawyer. He did not testify to the names of the other witnesses. He further testified that the paper was in the handwriting of the lawyer, and that the lawyer was present when the witness saw the paper, but made no remark about it, and that the testator said the lawyer was to be the executor of the will. Further on, the court said: " The bare declaration of the deceased that the paper which the witness saw was his will, does not tend to prove that it was executed as the statute† requires." That case was affirmed in 98 New York, at page 633, with the following memorandum: " Agree to affirm on ground that there is no competent evidence of the execution of a will." In *Grant* v. *Grant* (1 Sandf. Ch. 235), which was an action to establish a will alleged to have been lost, it was pointed out that the due execution of the alleged lost will must be shown, and that the declarations of the testator are not competent to prove either the existence of the lost will at the time of the death, or its due execution. So in

* See 2 R. S. 64, § 42; now Decedent Estate Law, § 34.— [REP.

† See 2 R. S. 63, § 40; now Decedent Estate Law, § 21.— [REP.

*Collyer* v. *Collyer* (4 Dem. 53; affd., 110 N. Y. 481) it was held that the factum of a lost or destroyed will could not be proved by declarations of the testator but should be proved in the same manner as though the will was produced in open court. (See, also, *Clark* v. *Turner*, 38 L. R. A. 433, 442.) Also the *dictum* of Lord Chief Justice CAMPBELL in *Doe dem. Shallcrois* v. *Palmer* (16 Q. B. [A. & E. N. S.] [1851] 747, 757) stated: " Declarations of the testator after the time when a controverted will is supposed to have been executed would not be admissible to prove that it had been duly signed and attested as the law requires." Also, Schouler on Wills (6th ed. § 813) is to the effect that such declarations are generally not admissible on the issue of execution. (See, also, 3 Wigm. Ev. § 1736.) If these declarations are not competent on the issue of the execution of a will, how can they possibly be competent as to one of the factors that go to make up execution, namely, publication? ·

I am, therefore, of the opinion that the learned surrogate was in error in following the *dictum* contained in *Matter of Kennedy (supra)*.

I recommend that so much of the decree appealed from as granted the motion of the proponent for the direction of a verdict be reversed upon the law and the facts, and that that part of the decree which set aside the verdict of the jury be affirmed, and a new trial granted, with costs to abide the event.

KAPPER, J., concurs with KELBY, J., for modification, and for a new trial, upon the ground that the evidence presented a question of fact as to the due execution of the will, but does not regard the constitutionality of section 457a of the Civil Practice Act as involved in such determination.

Decree of the Surrogate's Court of Kings county admitting will to probate affirmed, with costs.